CASE 61.—WILL CONTEST BY JOSIE CARTWRIGHT AND OTHERS AGAINST JOHN M. CHILDERS' EXECUTRIX, AND OTHERS.—January 25, 1910.

## Childers' Executrix v. Cartwright.

Appeal from Hickman Circuit Court.

R. J. BUGG, Circuit Judge.

From the judgment, defendants appeal.—Reversed.

1. Wills—Contest—Undue Influence—Burden of Proof.—The burden of showing that a will is invalid, because procured by undue influence, is on contestants.

2. Wills—Undue Influence—Measure of Proof—Evidence.—To set aside a will because procured by undue influence, it is not sufficient to show that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised, but there must be evidence showing its exercise.

3. Wills—Disposition of Property.—One of sound mind and disposing memory may transmit his property by will in such manner as pleases him.

4. Wills—Undue Influence—Sufficiency of Evidence.—Evidence held insufficient to show that the execution of a will was procured through undue influence.

SHELBOURNE & SMITH for appellants.

JOE W. BENNETT and ROBBINS & THOMAS for appellees.

OPINION OF THE COURT BY JUDGE BARKER—Reversing.

This action involves a contest as to the validity of the will of John M. Childers, of Hickman county, Ky.

On the 24th day of January, 1907, John M. Childers caused to be prepared the paper in question, which he duly executed as his last will and testament. By the instrument he devised all his estate to his wife, Bettie Childers, for her life, with remainder to six of his nine children living at his death. By the fourth item of his will it is provided as follows: "I have three other children, namely: Lula Smith, Josie Cartwright and Minnie Clark, to whom, on account of their disobedience and disrespect to me and their mother, I give nothing." The three disinherited daughters were the contestants in the court below and are the appellees here. The will in question is the counterpart of an instrument executed by the testator on September 22, 1906, with the exception that in the first will he disinherited only two of his daughters, Lula Smith and Josie Cartwright, whereas by the second will (that in contest) he added the name of his daughter, Minnie Clark, to those whom he disinherited. The testator died a short time after the execution of the second will, and the instrument was duly probated by order of the Hickman county court. From this judgment an appeal was prosecuted by the disinherited daughters to the Hickman circuit court, where a trial was had upon the issue whether or not the paper in question was the last will and testament of John M. Childers, with the result that the jury returned a verdict that the paper was not his last will

and testament, and from the judgment based upon this verdict the beneficiaries under the instrument have prosecuted this appeal.

The only ground upon which the validity of the paper was assailed is that its execution was procured by the undue influence of the beneficiaries, or at least some of them. Upon this appeal no question is made as to the propriety of the instructions given by the court to the jury upon the trial. The only question now raised is whether or not the verdict of the jury is sustained by the evidence.

At his death, John M. Childers was 56 years of age; his wife 51. They had been married something over 30 years. At the time of their marriage, Childers had no property, but by hard work and frugality he acquired an estate which at his death is admitted to have been worth as much in value as $20,000. So far as the record shows, the greater portion of his estate is farm land in Hickman county. Childers and his wife were rough, illiterate people, the husband being unable to sign his name. During their married life there were born to them nine children, six girls and three boys, all of whom are parties to this litigation. They kept no house servant, Mrs. Childers at first doing all the work, but after the girls were of sufficient age, they helped her discharge her onerous duties. Mrs. Childers was a faithful, energetic, and diligent housewife, frugal to a degree, and there can be no doubt that her faithful industry in keeping the house and taking care of the children contributed in large part to the acquisition of whatever fortune her husband left at his death. The appellees, the disinherited daughters, have left no stone unturned by which to besmirch the character of their mother.

They picture her as a cruel mother and a heartless wife, who had no affection for her husband and who hated her own children. They say that she not only beat them cruelly, but procured and induced their father also to beat them. They testified that she exercised a dominating control over their father, and that she was of a disposition to rule or ruin. A great deal of the testimony is entirely irrelevant to the issue involved here; and all of it, in our opinion, falls short of showing that the wife ever exercised or even attempted to exercise, any influence over the husband in the making of his will. As samples of the irrelevant evidence, the daughters testified that more than 20 years before the death of the father, and when the oldest child was quite small, the mother left the house and went to a neighbor's, stayed all day and only returned at nightfall at the earnest solicitation of the husband that she should do so. The wife explains this circumstance (and as to this she is not contradicted by any one) by saying that she left the house under the influence of jealousy, her husband having told her that he was paying attention to a woman in Cairo. What this had to do with the validity of the will made 20 or 25 years thereafter is difficult to perceive, and we are quite sure that it has no tendency to establish a dominating influence by the wife over the husband. Again: The daughters testified that the mother frequently said that she did not love her husband; that she was disappointed in her marriage, and other expressions of a like character. How this evidence conduced to unduly influence the husband to favor in his last will the woman who hated him, we are not able to see. As a rule, it may be said that men may be influenced by love or fear, but we do

not believe that any one ever induced another to make a will in his favor by exhibiting a hatred for the testator. And it is difficult to believe that the woman who bore her husband nine children and did all the housework necessary to conducting an extensive farming operation, patiently and faithfully for more than 30 years, living in the hardest and most frugal way, had no love for him for whom all this sacrifice seems to have been freely and uncomplainingly made. It was also testified by the daughters that their mother sometimes was harsh to them and sometimes inflicted corporal punishment upon them; but the admitted facts show that all these daughters were themselves disobedient, high-tempered, and self-willed. All of them ran away from home, and married contrary to the wishes of their parents, when quite young; Mrs. Cartwright being only 13 when she was engaged and fourteen when she married. Their testimony against their mother and the admitted facts show them to have been children who needed the repression of a strong hand and a dominating will. If they were not punished and restrained, as they grew up, the parents were neglectful of the high duty they owed them. But as said before, in the main all this evidence was irrelevant, and a careful reading of the record fails to disclose any evidence whatever which satisfied our minds that there was any influence brought to bear upon the testator to make the will in question except the bad conduct and disobedience of those children who were disinherited.

We will now take up in detail that part of the testimony that is specifically relied upon by the contestants to show undue influence. Mrs. Cartwright was asked: "Have you ever heard her (the mother) say anything about this will before your father died? A.

Said that if I married the boy that I did I would be out of the will.'' Dosie Faulkner, a witness for the contestants, was asked: ''Did you ever hear Mrs. Childers say anything about any of the children should not have any of the property? If so, state what was said. A. Yes, sir; I heard her say that Josie would never get anything of the estate, and that she would see that Johnnie did not will her anything.'' To Martin Gills, a witness for the contestants, was propounded the following question: ''Did you ever hear Mrs. Childers say anything about any of the children would not get any of their property? If so, state what she said. A'. Over there one Sunday evening, and the conversation come up some way; she seemed to be a little irritated at Minnie Clark, and made the remark that Minnie would never remember of getting the rapping of her finger of their estate; she said that Johnnie would never give her any of the estate.'' A witness, Tom Williamson, was asked if he had heard Martin Childers say anything about his father's business in any way, to which he replied: ''All I heard him say, Benton said something like this, that was the night that Mr. Childers lay a corpse, Benton said that he was pleased in the way that his father had his business fixed. Said that he was surprised that he had fixed it as well as he did. Then some little bit, and Martin says, 'Well I have talked to Pa a great deal about his business in the last few years, about the place, says I expect I caused him to fix it; anyhow seems he did.' '' Another witness, Ledia Faulkner, in response to a similar question, said: ''Said that his father's business was in good shape, and I reckon I was the cause of him leaving it that way.'' Now, in all of this there is not the slightest evidence that either Mrs. Childers or her

son Martin said one word to John M. Childers about
his will. So far as the testimony regards Martin, it
does not appear that he was talking about his father's
will at all. The testimony on this point shows that
it was limited to the way his father had left his busi-
ness affairs, and it does not appear that Martin knew
at the time anything about the contents of his father's
will. So far as the evidence affects Mrs. Childers'
conduct, assuming what was said by the witnesses to
be true, there is nothing that shows she ever spoke
to her husband on the subject of his will. The testi-
mony only goes to show that the mother was trying to
control her headstrong daughters by appealing to
their fear of being left out of their father's will.
The sum total, so far as the mother was concerned,
was a restraining threat of an anxious and, perhaps,
irritated parent; but that she ever actually said any-
thing to her husband on the subject of his will is not
shown by the testimony of any one.

There is no pretense that John M. Childers was
not of sound mind and disposing memory. On the
contrary, all of the evidence conduces to show that he
was a man of strong mentality, although illiterate
and ignorant of what is sometimes called book learn-
ing. That he was a shrewd, frugal, industrious man,
who worked hard, raised a large family, and in spite,
of his illiteracy died leaving, for his neighborhood,
quite a handsome estate, is not questioned. The great
preponderance of the evidence, if not all of it, shows
that he was a man not easily influenced, but who had
his own way, and who managed his own affairs with-
out the influence of any one. The appellees insist
that the wife admitted in her evidence that her hus-
band was childish. It is true, Mrs. Childers uses that
word in her testimony, but, clearly, she did not mean

that he was in anywise weak-minded or of a plastic disposition. The daughters testified that their father had sometimes been forced to sleep in what is called the washhouse, where he had .a bed, for the reason the mother refused to allow him to sleep in the house because he was so dirty. The wife explained the husband's sleeping in the washhouse ·by saying he could not bear the noise of the children, and she describes his nervousness by the word "childish." Her whole testimony refutes the idea that she meant he was weak-minded or easily influenced in business matters.

There is a good deal of testimony in the case that the testator was a good man, and that he loved his children; and we have no doubt that this is true. But this does not show that any one influenced him to disinherit his three daughters. There is no reason shown why Mrs. Childers should have desired the appellees disinherited and their three sisters provided for. If she desired the estate for herself and could influence her husband, it would seem natural that she should have had the entire estate devised to herself, but, instead of this, she only received a life estate, with remainder to the six children who were not not disinherited. When the second will was made, Childers went to the bank where the draftsman, Atwood, was employed, and dictated what he wanted, Atwood writing it on a typewriter. Neither Mrs. Childers nor any of the beneficiaries were present, nor is it shown that they knew the testator was making a will at that time. As said before, the second will was a counterpart of the first, with the addition of the name of Minnie Clark to the list of disinherited children. In neither case was it shown that the wife or any other beneficiary was present when either of the wills was prepared or executed. The rule is well

settled that, after due execution is proved by the propounders, the burden of showing that the instrument is invalid because procured by the exercise of undue influence is upon the contestants. This must be shown by evidence at least tending to establish that undue influence was exercised upon the testator. It is not sufficient that it be shown that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised; some evidence must be adduced showing that such influence was exercised. The law permits the owner of property, who is of sound mind and disposing memory, to transmit his property by last will and testament in such manner as pleases him, and juries are not permitted to make for him a will that accords with their ideas of justice and propriety; nor are they permitted to suspect away the right of the testator to dispose of his property in accordance with his own will and desire.

In the case before us the wife is shown to have done as much in the acquisition of the estate left by her husband as he did. It would have been impossible for him to accumulate the property he left without her aid given in the very manner in which she bestowed it. The wife who keeps the home, rears the children, does the work, and prevents waste in the household economy contributes as much to the acquisition of whatever estate is accumulated by the labor of the husband as he does; and although the legal title to the property may be in him, morally she is the owner of at least one-half of it. It was, therefore, not unnatural that the husband should desire to provide for the wife at his death; and it was, in our opinion, not unjust that he should leave her the use of the whole property during the few years

remaining to her after his death. The husband was bound to know that a life estate in one-third of his real property would, perhaps, not support the wife in the way she deserved, and it was only right and just that he should give her the whole estate while she lived. The only question, then, so far as the justice of the testator's will is concerned, is whether or not he did right in disinheriting his three daughters for the reasons given in the will. Of this he was the best judge. He knew the facts, and it was for him to say whether or not they had been so disobedient and disrespectful to him and the mother as justified his disinheriting them. It should take more than mere suspicion or the possibility of the exercise of undue influence to destroy a will which provides for the comfortable maintenance of a wife who raised 9 children for her husband and who for more than 30 years worked by his side and sacrificed her whole life in aiding him to acquire what he left. A careful reading of all the evidence in this record convinces us that the court should have sustained the motion of the propounders, made at the close of all the testimony, to peremptorily instruct the jury to find that the paper in issue was the last will and testament of John M. Childers.

The judgment is reversed for further proceedings consistent with this opinion.