## Crump, et al. v. Chenault, et al.

(Decided May 30, 1913.)

### Appeal from Clark Circuit Court.

1. Wills—Contest—Burden of Proof.—The rule is well settled that after due execution of a will is proved by the propounders, the burden of showing that the instrument is invalid upon the ground that it was procured by the exercise of undue influence, is upon the contestants; and this must be shown by evidence at least tending to establish that undue influence was exercised upon the testator.

2. Wills—Contest—Undue Influence.—In order to establish undue influence in the execution of a will, it is not sufficient that it be shown that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised; some evidence must be adduced showing that such influence was exercised.

3. Evidence—Will Contest—Testator's Mental Condition.—It is admissible to show the mental condition of the testator at the time his will was made, and his susceptibility to influence by which he was surrounded at the time; but it must be accompanied by some other evidence that the will was executed as the result of undue influence before the case will be permitted to go to the jury.

4. Evidence in Will Contest—What Is Evidence.—The foregoing rule does not conflict with the scintilla rule, since that rule requires some evidence, even though it be slight; and by evidence is meant something of substance and relevant consequence, and not vague, uncertain or irrelevant matter not carrying the quality of proof or having fitness to induce conviction.

PENDLETON, BUSH & BUSH, CLAUDE M. THOMAS, J. M. STEVENSON, O'REAR & WILLIAMS and ED. C. O'REAR for appellants.

JOUETT & JOUETT R. A. CHILES, LEWIS APPERSON, C. F. SPENCER and S. T. DAVIS for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This is an appeal from a judgment of the Clark Circuit Court sustaining the will of Alexander H. Anderson. The will was probated in the county court, and upon an appeal to the circuit court the contestants, who are appellants here, sought to set aside the will, upon the two grounds, (1) that Anderson did not have testimentary capacity to make a will, and (2) he was unduly influenced therein by his nephew Albert A. Clay. At the conclusion of contestants' evidence, the circuit judge peremptorily instructed the jury to find for the propounders, and from that judgment the contestants prosecute this appeal. This state of the record therefore, requires a careful examination of the evidence, with the view of determining whether there was sufficient evidence to carry the case to the jury.

Alexander H. Anderson owned and resided upon a farm containing more than a thousand acres, of unusual beauty and fertility, and located at "Indian Fields" in the southeastern portion of Clark County. The farm is worth $100,000.00 or more. The will in contest was executed on February 14, 1902, when Anderson was over 76 years of age. He lived seven years longer, and died on May 23, 1909, at the age of eighty-three. During the last five or six years of his life his eye sight had gradually failed, until at the time of his death he could scarcely see at all. In other respects, however, he ap-

peared to be sound and vigorous in both mind and body. His nephew, Albert A. Clay, commonly called "Ab." Clay, had been for many years his partner in a general store at "Indian Fields." Up to a short time before his death Anderson continued to go to the store twice a day, but these visits grew less frequent as his sight became worse. Anderson, however, never ceased to take his usual interest in his business, his wife reading to him and keeping him as fully informed of the events of the day as he could have done by reading for himself. He left a widow, but no children. He had had six brothers and sisters, of whom only one, a sister, Mrs. Susan Young, was living at the time the will was made. The other brothers and sisters were then all dead, but all of them had left descendants.

The will conveyed the estate to Hensley and Hathaway in trust, with instructions to rent out the lands and divide the net annual proceeds into six equal shares, of which one share was to go to the family of each of four brothers and sisters, while in the case of his deceased sister, Mrs. Clay, he gave one portion to each of the families of her two sons Albert A. Clay and Julian Clay. He gave no interest whatever to the children of his deceased brother Milton Anderson, who had died in 1863 leaving two daughters, who are the appellants, Mrs. Martha C. Crump and Mrs. Susan Rye. The shares were all devised upon precisely the same terms; and, as an illustration of those conditions, we quote the first clause making the devise to Albert A. Clay's family, which reads as follows:

"I direct that one of said shares shall belong to and be paid by my said trustees to my nephew, Albert A. Clay, annually as long as he lives, and after his death that said share shall be paid annually, in equal portions, one portion to each of the children of the said Albert A. Clay born in lawful wedlock, and *per stirpes* to the descendants of such children as may then be dead, and which said designated children and descendants are in being at the time of my death, to them during their lives and to their descendants *per stirpes* for twenty-one (21) years after the death of said Albert A. Clay's thus designated children and the above designated descendants of such children."

The testator had made a former will in 1892, and while that will has not been produced, it appears from the testimony of Mrs. Custis A Smith that the testator told

her in 1895 that he intended to give all of his nieces an equal share in his estate.

The will was drawn by Leeland Hathaway, a prominent lawyer of Winchester, and was witnessed by C. C. Curry and A. R. Curry. By an unimportant codicil executed November 9, 1903, and drawn by Curry, the testator director the portion going to the sons of his brother Albert G. Anderson to be held in trust for their benefit. This codicil also appointed Albert A. Clay his nephew, and English Anderson his great-nephew, executors of his will.

By a second codicil executed August 17, 1905, and likewise drawn by Curry, and witnessed by Curry and his brother, the testator added C. C. Chenault to the list of his executors.

It will be seen that the first takers under the will are all limited to a life-estate, and that none of his living descendants takes a fee. All, however, are treated substantially alike. While Mrs. Crump and Mrs. Rye are the only contestants who take nothing under the will, they are not, however, the only contestants, since they are joined by English Anderson and his three children, and twenty-one other devisees under the will.

Upon the question of the testamentary capacity of the testator there was a total absence of proof, except the testimony of the attesting witnesses and several witnesses introduced by the contestants, all of whom clearly establish his testamentary capacity. There was no evidence to the contrary.

Anderson was a man of many pecularities. Although a rich man, he and his wife lived alone in a cottage of four rooms, generally without a servant, although that fact is not unusual in country districts where servants are not easily obtainable. That he was stingy is conceded by all; but that he was an able and sagacious business man is not disputed by any one. He loved his land, and his sole ambition seems to have been to increase his acres. He saw little of his kin beyond the Clay nephews, who were near neighors, and seemed not to wish to be upon intimate terms with many people.

It is contended, however, that his nephew, A. A. Clay, had a great influence over him, and used it unduly to the exclusion of the children of Milton Anderson from the benefits of the will. As before stated, Milton Anderson had died in 1863, leaving a widow and two young daughters. In 1870 Milton Anderson's widow and chil-

dren moved to the adjoining county of Bourbon, and they never saw their uncle again during the 39 years of his subsequent life. The claim is made by the contestants that Albert A. Clay had, between the time when the first will was made in 1892, and the making of the second will in 1902, instilled into the mind of his uncle the belief, wholly without foundation, that the children of Milton Anderson were illegitimate, and that for that reason he excluded them from the benefits of his will.

We have examined the record carefully, with a view of stating all the evidence bearing upon this charge that Albert A. Clay exerted an undue influence over the mind of his uncle in the making of his will. In the first place, it is to be noted that Albert A. Clay had nothing whatever to do with the drawing of the will which made him an executor and placed him and his brother Julian and their families upon precisely the same footing as the other devisees.

For the purpose of showing an intention and willingness upon the part of the testator to include the now excluded children of his brother Milton among the benefiiciaries of his will, Mrs. Rye states that when she saw her uncle for the last time in 1870, she was quite young, and that he took her upon his knee and said, "If you grow up to be a nice young woman, Uncle Alex will do something for you some day." Mrs. Crump, referring to the same occasion, testifies that he said, "You be good little children, and grow up nice girls, and Uncle Alex will leave you something when he dies." Their mother corroborates them in these statements.

Mrs. Custis A. Smith, a niece, then about 14 years of age, sojourned with the testator from September, 1894, to March, 1895, during which time, according to her testimony, she frequently conversed with her uncle upon the subject of his will and the children of Milton Anderson. She says he frequently spoke of them, and exhibited a sympathetic feeling toward them; he seemed to have a great deal of love for them, and always spoke of them in connection with the making of his will. He further told Mrs. Smith that he expected to leave all his nieces an equal share of his estate, because it was harder for girls to get along in the world, than men. She says he further told her that he had given "Ab." Clay all that he intended to give him; and when she asked him what that was, he said he had given him a half interest in the store which they owned as partners. She further

says that she never saw her uncle Alex and Ab. Clay together in her life, and never heard them in conversation.

While it is quite unusual for an old man to talk business of this character with a girl only 14 years of age and who stood in no close relation of confidence to him, we will take this testimony at its face value. Mrs. Smith only lived at the house temporarily, and for the short period of six months, preliminary to her removing permanently to California.

Mrs. Anderson, the testator's widow, says her husband thought a great deal of Mr. Clay, and would frequently ask his advice on business matters. On one occasion he complained that Mr. Clay, who was his partner in the store, had unwisely incurred a partnership debt which worried Mr. Anderson a good deal. Mrs. Anderson never had any conversation with her husband as to why he omitted the Milton Anderson children from his will, but she says she once heard him talk with English Anderson upon that subject, when English said, "Uncle Alex, you ought not to have left out Uncle Milton's children in your will;" to which Mr. Anderson replied, "Well, they have never been about me any, and I know nothing of them; and Albert said I would not have to put them in." She again says that Mr. Anderson thought well of Mr. Clay; that he had raised him; and that while Mr. Clay was sometimes contrary with him, he did not want to turn against him while they were in business together. She further says that once or twice he said that Mr. Clay had not treated him right; that they had quarreled a time or two about business; and on another occasion when Mr. Anderson wanted to buy the West Bend property, he said Mr. Clay went to the sale and run it up on him and made him pay more for the land than he would have done, and that he did not like that in Mr. Clay. Mrs. Anderson further testifies that when, upon a later occasion, a contract was being drawn, whereby Mr. Clay was arranging to rent the Anderson land, Mr. Anderson sent for English Anderson to advise with him about the contract. On several other occasions he advised with English Anderson upon business matters.

Holt Everman, a brother of Mrs. Anderson, testifies that on one occasion Mr. Anderson said he wanted English Anderson to take his business and handle it for him; that he was afraid that Mr. Clay would do him some injury in some way; that he was going to put Mr. Carroll

Chenault in as an executor; that he wanted Carroll and English in as executors so that they could watch Albert, and that Albert would smuggle the estate if he could. Everman further testifies that Mr. Anderson said he hadn't provided in his will for some of his people as he should have done; that Albert thought they had not been about him any, and could not get anything, or something to that effect. He further testifies that Mr. Anderson once said there were some changes he would like to make in his will, but that Capt. Hathaway, the lawyer who had drawn the will, had advised him not to make any changes at his age—that Capt. Hathaway would not let him make the changes on account of his age. Everman has a claim against the Anderson estate for services in going to Mt. Sterling and getting whiskey for Anderson, at two dollars a trip, and for shaving him forty-five times at fifty cents a shave. The executors are contesting the claim.

S. F. Barnett, who has a suit pending against the Anderson estate for services, testifies that the testator had said upon one occasion that "Mr. Clay was the cause of the coolness of the Anderson heirs coming to see him, because he was jealous of them;" that he wanted to change his will, and that he was afraid that Mr. Clay was going to try to rob the other heirs.

The only remaining witness is English Anderson, the great nephew of the testator, who testifies quite at length concerning conversations with his uncle, the testator. He says his uncle told him that "Ab." had spent a great deal of money, and that he did not understand how he had done it. This worried the testator a great deal, and he was very much provoked about it, just as any man would be on suddenly hearing about something coming up that he did not know about. Referring to the will, he says his uncle told him, in their first conversation upon that subject, that he had been made an executor of the will; and continued saying, "He told me that he had divided his property up into four parts. He said that he had left me and Albert just the same, and made us his executors, and asked me what I thought about it, and I told him I thought it was a very good thing."

English Anderson reports a subsequent conversation as follows: "The next time he talked with me, he said he had cut Uncle Milton's children out of the will. I asked him why? 'Well,' he said 'I haven't seen them since they were little things,' and he didn't seem to think

a great deal of his brother Milt. He said, 'Ab. says that they can't do anything.' I said, 'Uncle Alex, they are sure to attack your will.' He says, 'Ab. says they can't do anything to it.' "

English Anderson further says that he always told his uncle that he thought the Milton Anderson children should be included in the will, because he felt they would cause the executors trouble if they were omitted. He says the anticipated trouble was the principal reason for the advice he gave his uncle. English Anderson further testifies that his uncle, after he had advised him to change his will so as to include Milton Anderson's children as devisees, said, he wanted to change his will but he was so old he was afraid to do so. He did not say anything about Albert Clay in that connection.

Finally, English Anderson closes his testimony upon this subject, as follows:

"Q. Were you here in town the day the will was probated? A. Yes sir. Q. Did you see Mr. Albert Clay that day? A. Yes, sir. Q. Did you talk to him about the will? A. Yes sir. Q. Did he say anything to you with reference to the matter of leaving out Milton Anderson's children? A. Yes sir, when we first read it, I asked; 'Cousin Ab. why do you reckon he cut Uncle Milton's children out?' He said, 'Why, he did not believe they were his children. 'Q. Did you say anything more to Mr. Clay about it then? A. Well, it was a surprise to me. Q. What did you say to him? A. I didn't say anything just at that time that I remember of. I never dreamed of such a thing. Q. Had you ever heard that mentioned in any the family connection? A. Had not. Q. In the family history at that time? A. Did not. Q. Now, Mr. Anderson, did any of these other devisees, Mr. Chenault, the executor, or any of the devisees in Montgomery County or out West, make a habit of visiting him? A. No sir, my father and grandfather both advised me not to go to see him. Q. Why? A. They didn't like him. Q. Was there a friendly relation existing between him and the rest of his family? A. Well, he was selfish and was close. I don't think any of them thought very much of him. Q. Did any of them visit him, so far as you know? A. I don't think so. I think, may be, Uncle Jo's widow has been down to see him, or something of that kind."

But, in an earlier stage of his testimony, English Anderson had testified as follows:

"A. When the will was read, I wasn't very much pleased with it, and thought at the time, may be, I wouldn't qualify as executor. Me and Ab. Clay talked about it at the time. He would not. He said that he had claims against it. And I had heard Uncle Alex talk a great deal, and I thought possibly—"Q. Tell what was said. Did you tell them what your wishes were about this matter? A. About being cut out of the will? Q. Yes. A. Yes, sir. Q. Did you say to them whether they ought to resist the will? A. I told everybody, from Uncle Alex himself clear down. I had heard my father and my grandfather talk about this, and I never questioned but what they were Milton Anderson's children, and there's none in my mind now, either, gentlemen."

Without undertaking to reconcile these statements as to what English Anderson knew concerning the history of his Uncle Milton's family, it is but reasonable to conclude therefrom that the paternity of Milton's children had been discussed in the family generally.

This is all the testimony bearing upon the subject of undue influence; and in our opinion it amounts to nothing. Taking the testimony as true, it only shows that while the testator was friendly to Albert A. Clay and his family by reason of their long intimate business relations, he did not rely upon his advice or judgment any more, and perhaps not as much as he relied upon the judgment of English Anderson.

Furthermore, according to the testimony of some of the witnesses, the testator was suspicious of Albert Clay, and, if that were true, he certainly was not influenced by him. When the testator came to lease his land to Albert Clay, he called in English Anderson as his advisor. There is no evidence whatever even tending to establish the claim of contestants that Albert Clay had influenced his uncle to omit the Milton Anderson children from his will. Mere suspicions and opinions are not evidence.

In Childer's Exr. v. Cartwright, 139 Ky., 505, we laid down the following rule as to the character of evidence necessary to establish undue influence in the execution of a will:

"The rule is well settled that, after due execution is proved by the propounders, the burden of showing that the instrument is invalid because procured by the exercise of undue influence is upon the contestants. This must be shown by evidence at least tending to establish that undue influence was exercised upon the testator. It

is not sufficient that it be shown that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised; some evidence must be adduced showing that such influence was exercised. The law permits the owner of property, who is of sound mind and disposing memory, to transmit his property by last will and testament in such manner as pleases him, and juries are not permitted to make for him a will that accords with their ideas of justice and propriety; nor are they permitted to suspect away the right of the testator to dispose of his property in accordance with his own will and desire.''

And, in Raison v. Raison., Exr., 148 Ky., 120, we further said:

''It is admissible to show the mental condition of the testator at the time the will is made and his susceptibility to influence by which he was surrounded at the time; but it must be accompanied by some other evidence that the will was executed as the result of undue influence, before the case will be permitted to go to the jury.''

Clark v. Young's Exr., 146 Ky., 377, is similar to the case at bar, in the fact that the evidence was there held insufficient to take the case to the jury, and a peremptory instruction was given directing the establishment of the will. Moreover, an examination of the testimony as outlined in the opinion in that case will show that there was perhaps more evidence there tending to show undue influence, than there is in the case at bar. Nevertheless, in sustaining the peremptory instruction in that case, we said:

''That a father may think it best to transfer a feeble-minded child from one institution not specially provided with facilities for instructing the child to another created and maintained by the State for educating children so afflicted, is not in our opinion evidence of undue influence on the part of the person who suggests the propriety of such action. Nor can a father be said to be the subject of undue influence for yielding to the suggestion that his young daughter be kept at home and instructed in music by a teacher in a large city like Louisville in preference to sending her to Cincinnati for that purpose. Here then we have a case predicated on opinions based either on the inequality of the will, or the two circumstances above referred to. As neither the inequality of the will nor the circumstances referred to are sufficient to show undue influence or mental incapacity, it follows

that opinions based thereon are likewise insufficient for that purpose. (Smith v. Commonwealth, 129 Ky., 433; Sanders v. Blakely, 21 Ky. L. R., 1321; Bush v. Lisle, 89 Ky., 393). Nor does this conclusion conflict with the scintilla rule, for that rule requires some evidence even though it be slight; and by evidence is meant something of substance and relevant consequence, and not vague, uncertain or irrelevant matter not carrying the quality of proof, or having fitness to induce conviction. (Minnehan v. Grand Trunk, 138 Fed., 37.)"

Under the rule above announced, there was not sufficient testimony to carry the case to the jury, and the circuit judge properly so ruled.

Judgment affirmed.