### Brent, et al. v. Fleming.

(Decided June 10, 1915.)

## Appeal from Mason Circuit Court.

Wills—Contest—Evidence—Peremptory Instruction.—In a will contest, evidence of undue influence considered and held insufficient to take the case to the jury.

J. P. McCARTNEY, A. D. COLE and F. P. O'DONNELL for appellants.

O. R. BRIGHT, B. S. GRANNIS and WORTHINGTON, COCHRAN & BROWNING for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

This is a contest over the last codicil to the will of John T. Fleming, deceased, who died a resident of Mason County in the month of May, 1913. From a verdict and judgment in favor of the contestants the contestees appeal.

The contest is based on mental incapacity and undue influence. Only the question of undue influence was submitted to the jury. Appellants insist that the evidence of undue influence is not sufficient either to take the case to the jury or to sustain the verdict. The decision of this question will necessitate a somewhat extended statement of the facts. The original will was executed February 18th, 1907. At that time the testator's wife, Adeline E. Fleming, was living. By this will he devised all of his estate to his wife for life, with the privilege of using and consuming it all if necessary for her support and comfort. On the death of his wife he devised to his friend and business partner, J. G. Wadsworth, a one-half interest in a tract of land consisting of 240 acres, which he and Wadsworth jointly owned. The remainder of his estate he devised equally to Patsy Lee Fleming, wife of his nephew, T. M. Fleming, and to the appellant, Mary F. Brent, who was also his niece. On November 3rd, 1910, he added a codicil, which provided that Patsy Lee Fleming's portion of the estate should go to her for life, with the remainder to her three children, Mrs. Adeline E. Drennan, Patsy Lee Fleming and Charles M. Fleming. Patsy E. Fleming's oldest son, William H. Fleming, was excluded from this devise. In November, 1910, the testator's wife died. On

January 14th, 1911, the testator added another codicil to his will which, after making certain bequests of personal property, provided that if any effort was made to subject Patsy Lee Fleming's share to the payment of her debts, her life estate should be extinguished and her share should pass at once to the three children named above. He appointed J. G. Wadsworth, his business partner, his executor. On July 9th, 1912, the testator added another codicil, by which he devised to appellant, Mary F. Brent, 1,080 acres of land in Chautauqua County, Kansas, and to Mrs. Patsy Lee Fleming all his bonds in the Williamsville, Greenville and St. Louis Railway Company. The balance of his estate not otherwise disposed of he devised in equal parts to Patsy Lee Fleming and appellant, Mary F. Brent.

While the testator died in his eighty-eighth year, no attempt was made by the contestants to show that he was lacking in mental capacity. On the contrary, his attorney and family physician, his neighbors and friends, and his business associates make it clear that he was a man of unusual strength of mind, of broad culture and of strong and unyielding conviction. Not a single witness testified that he was easily moved or susceptible to influence. All agreed that his strength of mind and force of will continued with him until a few days before his death. Some two or three years before his death the testator requested Mrs. Brent to come to his home. She did come, but after being there for a short while she went back to her own home in Chicago. At the instance of the testator she subsequently returned to Maysville and remained there practically all of the time until the testator died. During that time she was very careful of his wants and very devoted in her attentions. By reason of the fact that his ankles were swollen and he could walk only with difficulty, he remained in the house and demanded a great deal of nursing. He was quite deaf and Mrs. Brent read to him a great deal. Indeed it is conceded by all concerned that because of her bright and cheerful disposition she succeeded in making the testator's home much more comfortable and in bringing to him a great deal of sunshine during the closing days of his life. It appears that the testator had bought the Kansas farm a good many years ago and that R. T. Long had purchased it for him. Subsequently Long rented the farm, but the rent was not paid. Some time before the testator's death, Long came to Mays-

ville for the purpose of selling the bonds of the Missouri railroad. In settlement of his obligations to the testator, he and the testator made a trade by which the testator purchased $23,000.00 worth of these bonds at 80 cents on the dollar. These are the bonds which the testator devised to Mrs. Fleming. At the time of the contest the railroad was in the hands of a receiver and the bonds had no market value. One witness, who seems to be well posted as to the value of the road, fixes the value of the bonds at about 20 cents on the dollar. The contest is based on the theory that Mrs. Brent, who knew that the bonds were not valuable, unduly influenced her uncle to give her the ranch, consisting of 1,080 acres, worth $12.00 an acre, and to give the bonds to Mrs. Fleming. The evidence on which this contention is based is that Mrs. Brent was constantly present with the testator and had an opportunity to influence him. A negro servant testified that she heard Mrs. Brent reading to the testator a letter from her grandchild, asking the testator to give her the Kansas ranch. While a resident of the testator's household, he made her a present of $2,500 worth of property. Mrs. Brent made inquiries as to the value of the bonds and was assured, in effect, that they were of but little value. R. T. Long, who sold the bonds, came from Kansas City where Mrs. Brent formerly lived. After the railroad defaulted in the payment of the coupons, certain payments of the interest were mysteriously made by someone. The testator had frequently declared his purpose to make Mrs. Brent and Mrs. Fleming equal. By the last codicil he gave Mrs. Brent the ranch, which was worth $12,960.00, on the basis of $12.00 an acre, and $16,200.00, on the basis of $15.00 an acre, whereas the bonds given to Mrs. Fleming have no market value and are not estimated to be worth more than $4,600.00.

We have frequently written that it is not sufficient to show that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised, but some evidence must be adduced showing that such influence was actually exercised. Crump v. Chenault, 154 Ky., 187, 156 S. W., 1053; Childers' Exor. v. Cartwright, 136 Ky., 505, 124 S. W., 804. And by evidence is meant something of substance and relevant consequence, and not vague, uncertain or irrelevant matter not carrying the quality of proof, or having fitness to induce conviction. Clark v. Young's Extx., 146

Ky., 377. It is also the rule that any reasonable influence obtained by acts of kindness or by appeals to the feelings or understanding, and not destroying free agency, is not undue influence. On the other hand, undue influence is such influence over the mind of the testator as destroys his free agency and constrains him to do against his will what he would otherwise refuse to do, whether exerted at one time or another, directly or indirectly, if it so operated on his mind at the time he executed the paper. Watson's Exor. v. Watson, 137 Ky., 25. It may be conceded that where the testator is mentally deficient, or is easily controlled, very slight circumstances, in addition to inequality in the distribution of his estate among the natural objects of his bounty, will be sufficient to establish undue influence. But no such case is here presented. Every witness and every circumstance of the case show that the testator was a strong-minded, self-willed man, and not easily moved by anyone. A remark which he made to a daughter of Mrs. Fleming illustrates his character: She had asked him if Cousin Mary (appellant) was pleased with the will. He replied: "To the devil with Mary; this is not Mary's will, this is my will." Suppose, then, that Mrs. Brent's grandchild did ask the testator to give her the ranch. Suppose that she herself asked him to do it. Can it be said that this shows that he acceded to her wish, not because of his affection for her, but because his free agency was destroyed and he was constrained to do against his will what he otherwise would have refused to do? It is true that he did give Mrs. Brent property of the value of $2,500.00, but he had also given to Mrs. Fleming property which he valued at $3,200.00, from which he claims that she, by bad management, received only about $600.00. He had also given her four or five hundred dollars in cash. But even if he had given Mrs. Fleming nothing, can it be said that this gift shows that his iron will had been broken, in view of the fact that the gift was not even sufficient remuneration for the long months of unceasing care and attention which she had given to him? Is not the gift altogether consistent with his natural affection for her and the gratitude which he must have felt? But great stress is placed on the fact that Mrs. Brent made inquiries in regard to the value of the bonds. The evidence, however, shows that Mr. Long had proposed to trade her $15,000.00 worth of bonds for her Kansas City

residence. The testator thought the trade would be a good one. To ascertain whether it would or not, Mrs. Brent applied to a bank officer. The bank officer expressed the opinion that the trade would not be a good one. Stress is put on the fact that Long came from Kansas City, where Mrs. Brent formerly lived, and that interest on the bonds after the railroad defaulted was mysteriously paid by someone. It is suggested that, in some way or other, Mrs. Brent was connected with this transaction and, by reason of this fact she unduly influenced her uncle to give her the ranch. In reply to this contention it is sufficient to say that there is not a scintilla of evidence tending to show that Mrs. Brent was in collusion with Long. The mere fact that she had known him and his wife had visited her, or that he knew her address, is not even sufficient to excite a well grounded suspicion. The theory that Mrs. Brent was concerned in the sale of these bonds to the testator is not only not supported by any evidence, but is flatly absurd. It is unreasonable to suppose that she would take steps to diminish the estate in which she expected to share.

If we leave the field of mere suspicion and conjecture and turn to facts which are established beyond all question, we discover the following conditions: The will and each of the codicils were drawn by the same attorney and each was attested by the same witnesses. When the last codicil was drawn testator's mind was perfectly clear and he directed the executor what he wanted done. He stated that he wanted Mrs. Brent to have the ranch because her sons-in-law were western men and could look after it. He also stated that he had formerly given Mrs. Fleming some land but, by reason of bad management, she had not gotten out of it what he paid for it. He said that on this account it would be better to give the bonds to her so that she would have nothing to do but to collect the coupons. To this end he had the executor make a calculation as to the value of the land and the value of the bonds on basis of 80 cents on the dollar. No secrecy attended the execution of the codicil in question. The testator stated to others the provisions of the codicil. It was not long after its execution before Mrs. Fleming came to his home and he told her of the provision he had made for her. He also told her that he had given her more than he had given Mary. Mrs. Fleming says that she told him that

she didn't want the bonds; all she wanted was half of the estate. It further appears that she became dissatisfied with the arrangement and discontinued her visits. Her son afterwards made inquiries at the bank as to the value of the bonds and the testator was displeased because her son had discussed his business with other parties. These facts show that the testator knew what he wanted to do with his property and in making the codicil carried out a fixed purpose of his own. The case is one where the testator was simply mistaken as to the value of the bonds. In the face of such incontrovertible facts as these, no jury should be permitted to guess away the right of a testator to dispose of his property as he sees fit, merely on circumstances which do not carry conviction, but are sufficient only to excite suspicion. The evidence, we think, was wholly insufficient to take the case to the jury. Hildreth v. Hildreth, 153 Ky., 597; Childers' Ex. v. Cartwright, 136 Ky., 498; Crump v. Chenault, *supra;* Clark v. Young, *supra.*

Judgment reversed and cause remanded with direction to enter judgment probating the codicil in question.