## Jones v. Beckley.

(Decided February 13, 1917.)

### Appeal from Jefferson Circuit Court (Common Pleas, Second Division).

1. Wills—Validity—Undue Influence.—To show undue influence sufficient to invalidate a will, it is not enough that there was an opportunity to exercise such influence, or a possibility that it was exercised, but there must be substantial evidence that it actually was exercised.

2. Wills—Validity—Undue Influence.—Reasonable influence obtained by acts of kindness or appeals to the feelings or understanding is

not undue influence which will invalidate a will, but it must be shown that the influence was such as to destroy the testatrix's free agency and to constrain her to do against her will what she would otherwise have refused to do.

3.  Wills—Contests—Sufficiency of Evidence—Undue Influence.—In a will contest, evidence of undue influence considered and held insufficient to take the case to the jury.

JOHNSON, HIEATT & SCHEIRICH and JOSEPH J. HANCOCK for appellant.

EDWARD BLOOMFIELD and EDWARDS, OGDEN & PEAK for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

Mrs. Mary Anna Frances Jones died a resident of Jefferson county on June 4, 1914. She left surviving her a son, Edward Garr Jones, and a daughter, Jennie Jones Beckley. Her will, which was duly probated by the Jefferson county court, is as follows:

"March 14, 1914.

"This is to state that in the event of my death I appoint my son, Edward Garr Jones, executor of my estate without bond and wish no inventory of my estate taken.

"After my just debts and personal expenses are paid I leave to my daughter, Jennie Allan Jones Beckley, five dollars.

"The balance of my estate, real and personal, I leave to my son, Edward Garr Jones.

"I have written this of my own free will and accord and without knowledge of my son.

"ANNA FRANCES JONES.

"SUSIE McD. ALLEN.
"C. R. BRENT."

Jennie Jones Beckley brought this suit, contesting the will on the ground of testamentary incapacity, and on the further ground that the will was obtained by fraud, duress and undue influence. During the progress of the case the testamentary incapacity of the testatrix was abandoned as a ground of contest. The only question submitted to the jury was whether the will was obtained by undue influence. The jury found against the will, and from a judgment based on the verdict, Edward Garr Jones prosecutes this appeal.

Appellant contends that the evidence of undue influence was not only insufficient to sustain the verdict, but was also insufficient to take the case to the jury.

It appears that the husband of the testatrix died in the year 1890. At that time Edward Garr Jones was about seven and one-half years of age, while Jennie A. Jones was about six years of age. With certain insurance money which she received from her husband the testatrix bought two small cottages. With the rent from these cottages the testatrix maintained a modest home and sent the two children to school for about six years. At that time she had to sell one of the houses to discharge certain indebtedness which she had incurred. It also became necessary for her to take the boy out of school and put him to work. The boy first received $2.00 per week, then $15.00 per month. From that time on, covering a period of about sixteen or seventeen years, he received various promotions, until, at the time of his mother's death, he was earning a salary of $100.00 per month and a certain allowance for expense money. Shortly after the boy started to work his grandmother loaned him a cow and he began to sell milk in the neighborhood. With his earnings he bought three more cows and thereby increased his dairy product. He tended the cows early in the mornings and late in the evenings so as not to interfere with his work at the railroad company by which he was employed. He continued to sell milk for a number of years until he became ruptured and found it necessary to sell the cows. Up until the time of his mother's death he gave his mother all of his earnings.

The contestant was kept in school for about ten years after the boy stopped. She finished the high school course and then equipped herself as a teacher by taking the course at the normal school. While she was a student, however, she assisted her mother in the household work and also did her part in connection with the dairy. When she first began teaching her salary was $40.00 per month. It was gradually increased, however, until finally she was earning $60.00 per month. With the exception of about $5.00 per month, she turned over her salary to her mother. Thus the living expenses of the family were provided for out of a common fund, made up of the earnings of the boy and girl. While the girl was still in school, the second cottage had to be sold in order to meet some debts. After the debts were paid there remained

about $400.00. This sum, together with a portion of the boy's earnings and a $300.00 bequest made to the boy and a like bequest made to the mother, and $1,000.00 loaned to the mother by Mrs. Hite, was invested in a cottage on Bellewood avenue in the city of Louisville. About two years before the death of the testatrix the home on Bellewood avenue was sold, and with the proceeds a home on Pennsylvania avenue was purchased for about $4,000.00. Of this amount about $3,000.00 was paid in cash. The balance was evidenced by a lien note. The property that she willed to the son was the Pennsylvania avenue home, subject to certain debts. When the family was preparing to move to the home on Pennsylvania, a disagreement occurred between the boy and the girl as to the purchase of some new furniture for the home, and because of this disagreement the girl refused to go with her mother and thereafter boarded until she was married. The mother tried to induce the daughter to return and to that end sent a minister to intercede with her daughter. The daughter, however, refused to return to her mother's home. About one year later the daughter married. When her baby was born her mother was not advised of this fact. About one year later the mother died. She never saw her daughter after the family moved to the Pennsylvania avenue home. The daughter, who arrived at the infirmary after her mother's death, says that her failure to get to the infirmary before her mother's death was due to the fact that a promised message informing her of the mother's condition was not received in time. The amount of money contributed by the boy to the support of the family was between $10,000.00 and $12,000.00, while that contributed by the daughter was between $3,000.00 and $3,500.00.

The will was executed under the following circumstances: A few months before her death the testatrix told Mrs. Allen, a friend of hers, that she wanted her to come out some time and write her will. Later on she telephoned for Mrs. Allen to come and do some writing for her. She asked Mrs. Allen if she knew how to frame a will. The latter replied that she did. She then told Mrs. Allen that she wanted to leave everything she had to Garr. Mrs. Allen made out a little pen sketch for her. The testatrix then began to copy the sketch. Being interrupted by a caller, she said to Mrs. Allen: "You leave this with me and I will copy it and then you come back and we will sign it together." When Mrs. Allen

returned the testatrix had copied the will. Mrs. Allen suggested that both she and Mr. Brent, who lived across the street, should sign the will. Afterwards it was signed by Mr. Brent. Mrs. Allen further says that Garr Jones knew nothing of the execution of the will. She herself took the will and kept it until after Mrs. Jones' death. She then informed Garr of the will. Both Mrs. Allen and Mr. Brent testified to the testatrix's clearness of mind and of her freedom of any influence so far as they knew. The physicians who attended the testatrix during her last illness say that her mind was clear up to the time of her death. Several other witnesses who knew the testatrix very intimately also testified that she had a strong mind and will of her own. They also spoke of the fidelity and devotion of the son to his mother and of her love for him.

The evidence for the contestant is as follows: While she was at school she did her share of the household work, and after she began to teach she also did her share of the work and contributed practically all of her earnings to the maintenance of the family. She says that her brother dominated the home. His authority was absolute. He commanded and the others obeyed. On being asked the question, "Was it your mother's wish or your brother's wish that you would not move with them to Pennsylvania avenue?" she answered: "It was my brother's wish. Of course, it was my mother's wish then, after it was my brother's wish." In describing the disagreement concerning the purchase of the furniture for the Pennsylvania avenue home, she said:

"My mother came home and we had some old carpets made into rugs. They had been delivered and were in the parlor. I took him in there and showed him the rugs and then began to tell him what we were going to do, and instantly the question arose and he said that I wasn't to purchase the porch swing. That the porch swing was not to be purchased. I asked him why. Because, he did not see any necessity for it. That brought up the trouble. Then my mother had been, as I say, perfectly delighted that I had undertaken this; then she saw it displeased my brother and then she instantly refused to say what was right and what wasn't right. She was afraid to cross him in his wish. It went on then for several days and my mother told me I might have the porch swing. I said, 'Mama, it is not the question of the porch swing; that is immaterial, but I have been

kicked about and treated, not as a daughter. Company, neither lady nor gentleman, was ever welcome, because I could cite you instances when they would come and be mistreated.' ''

Again she said:

"But it did not make any difference what was said, it was 'snap off, snap off and snap off.' I had no say at all."

Continuing she testified as follows:

"Q. At any time did you talk to your brother in the presence of your mother regarding this sort of treatment? A. I frequently, whenever it would occur as I say, whenever this trouble came up, it was always between the three, and she heard everything I would say to him. Q. What would your mother say and how would she act? A. She didn't say anything. She would just remain, you might say, neutral. Q. Didn't she reprove him for this mistreatment of you? A. Never. Q. Who, as a general thing, gave orders about the home there, and whose will was it? A. It was my brother's will. Q. When you talked to your mother about this treatment of your brother, what would she say? A. She didn't say so very much; in a way, she would seem as though she wished conditions could be different, but it was just so it could not be different. She was afraid in a way, you might say, to cross his opinion, or to cross his commands. Q. To what extent did he exercise an influence over your mother? How far did that influence go? A. Mr. Ogden, I could not tell you how far it went, as I say it extended through everything. Whatever was to be undertaken, whatever was undertaken it was always the same way."

Concerning her appeals to her mother to effect a reconciliation between her and her brother, her testimony is as follows:

"Well, I have appealed to her but she would never commit herself. She never—just as I say in the same instance of the separation—she could have settled it in a moment, but she hesitated.

"Q. Would you state, please, whether you can recall your mother's disagreeing with your brother at any time? A. I never knew of a time when my mother disagreed with my brother."

The contestant further says that her brother never treated her friends and acquaintances in a pleasant way.

On one occasion she says that he struck her in the presence of a gentleman caller. This occurred while she was a student at the high school and about twelve years before the testimony was given. She also claims that on another occasion, while she was a student at the high school, her brother struck her. The gentleman in whose presence the contestant was struck testified as follows:

"Well, I saw Garr, her brother, strike her at one time, among other things, and I have seen her humiliated at different times in my presence, when I was there to call, family quarrels being brought up and thrashed out in the parlor.

"Q. Who would bring up these family quarrels? A. Why, all that I saw—not all, but all but one that I saw was brought up by Garr. Q. Did you see the mother present at any of these times? A. Only occasionally. Q. When she was present whose side would she take and what part would she take in the discussions? A. She always took Garr's part. Q. At any time, did you hear Garr criticise his sister for her conduct? A. Yes, I did. I don't believe I ever heard him do anything else but criticise her. Q. When he was about, I wish you would state, whether he would engage in friendly conversation with his sister or whether he was the opposite? A. No, it wasn't friendly. Q. How did he usually conduct himself towards his sister? A. Well, he was usually very sharp in what he had to say and very exacting towards her in what dealings he had with her. Q. You spoke about the one occasion of Garr smacking his sister. I wish you would just give to the jury the circumstances under which that occurred? A. Why, Jennie had a ring that I loaned her, and her mother and Garr both objected to her having it, and I called one evening about supper time to get the ring, and she had gotten up from the table, and came to the side porch to give it to me, and Garr forbade her giving the ring to me; he wanted to give the ring to me himself; he came out and ordered her back in the house and she wouldn't go and he simply struck her."

Mrs. J. B. Quinn, a sister of the husband of the testatrix, stated that while the contestant was a student in the high school she came to the home of witness on one occasion, and she saw marks of bruises on her body. Thomas S. Jones, a brother of the testatrix's husband, also testified that on one occasion, while Jennie was a

student in the high school, she came to his house with scratches and bruises on her face and arms, and that she was in a very nervous condition. He had not seen anything of his brother's family for twenty or twenty-five years. B. F. Pearcy, who knew the Jones family, was asked if he had observed the conduct of Mr. Garr Jones towards his sister during the time they lived on Belle-wood avenue, and replied that all he could say was that Garr seemed to be the head of the house. So far, however, as he knew, the relationship between the brother and sister at that time seemed to be friendly. He also stated that he never heard Mrs. Jones praise her daughter. He further testified as follows:

"Q. Tell the jury how Mr. Garr indicated his will that he had his way up there? A. Well, I couldn't intelligently explain to the jury that, only you can judge, by going into a home, if you are in there a little while, as to who rules that home. Q. Did Mrs. Jones, the mother, seem to be in fear of her son? A. No; not in my presence; I couldn't say that there was any fear demonstrated there at all, but it seemed like Garr was the head of the house, and whatever he said, why that was the law and the gospel. Q. In your opinion, Mr. Pearcy, did Mr. Garr Jones exercise any influence over his mother? A. Yes, sir."

Mrs. Cora Russell, in response to the question how Mrs. Jones talked about her daughter, said:

"She did not talk very well against her. I just couldn't explain, just how she did talk. She didn't seem to want me to say anything in her favor, and she seemed to be a very unnatural mother, I thought. Q. How did Mrs. Jones, the mother, act towards Miss Jennie at times in praise of her or otherwise? A. Never in praise of her. Q. Did you hear her criticise the boy, Garr? A. Never."

Miss Julia McGuffin, after stating that the mother criticised the daughter at times and she did not think that she had ever heard her criticise the boy, also stated that the mother favored the boy. She also testified as follows:

"Q. How often did you notice this favoritism, which you say was displayed on behalf of the boy? A. That was all the time, that she favored him. Q. Now from what you observed in the home, there, I wish you would state whether or not in your opinion the boy exercised

an influence over his mother, or otherwise? A. Well, I should think if she favored him, she certainly was influenced."

Mrs. Stafford, another witness, testified as follows:

"Q. Well, what made you think Mrs. Jones had a preference for her son? A. Well, the way she spoke to him. Q. How? What impressed that fact on your mind? A. Well, in Jennie having company and she said Garr would do more for her than Jennie would."

Mrs. Tucker, who had not seen anything of the family for two or three years testified as follows:

"Q. Could you tell the feeling of the mother towards her two children? Both towards the boy and the daughter? A. Yes, I thought I understood it. Q. What was it? A. Well, I thought that she was partial to her son, very partial, and I thought she was afraid of him, but I only thought she was. From what I could see I had a reason, I thought, for thinking she was afraid of him, afraid of displeasing him. I thought she was very partial to her son. Q. Well, did she say anything to you any time that made you believe that? A. Yes, because she never found fault with her son in anything. She would always seem to agree with everything he did, but I always felt sure that she was afraid often times to exercise her own opinion. Mothers are different. I always said to one child just the same as to another, if I thought they deserved it, but I don't think she was that kind. I thought she was hard on the daughter, and that she was influenced. Q. By whom? A. The son."

Again:

"(Cross-examination.) When you say that you think she was influenced by her son, you are just merely expressing a surmise and opinion of what you have drawn from what other people have told you? A. No, from her actions, her own conversations and what I know of myself, she was unduly influenced by her son. Q. What do you mean by unduly influenced? A. He had an influence over her that a son shouldn't have had. Q. What influence was that? A. I think she was afraid of him. Q. What makes you think so? A. She never seemed to exert her opinion over her boy. She agreed with everything he did that wasn't right."

Mrs. Tucker further testified that Mrs. Jones had a will of her own and Mrs. Jones told her that Jennie was

not speaking to Mrs. Jones, and this grieved Mrs. Jones very much.

It is due the contestee to say that he denies ever having struck his sister, and claims that he objected to his sister's caller, who testified for her in this case, because he did not approve of the caller's conduct.

In the foregoing statement we have copied at length those portions of the evidence which counsel for the contestant insist are sufficient to show that the will was obtained by undue influence. Stripped of unnecessary surplusage, the evidence referred to tends to establish the following: The contestee struck the contestant on two occasions several years prior to the execution of the will. On these occasions, and on subsequent occasions when contestant and contestee disagreed, the mother remained neutral and did not reprove the contestee. Contestant expressed the opinion that her brother dominated the home and that his authority was absolute, but she gives no facts on which this opinion is based. One witness says that the contestant criticised his sister's conduct and was exacting in his dealings with her. Other witnesses corroborate contestant as to there being scratches and bruises on her face and arms on certain occasions. Another witness says that, while she could not say that Mrs. Jones showed any fear of her son, it seemed to her that the son was the head of the house and, in her opinion, he exercised an influence over his mother. Another witness says that Mrs. Jones never praised her daughter and that she never heard Mrs. Jones criticise Garr. Another witness says that Mrs. Jones always favored her son, and expressed the opinion that if she favored her son she was influenced by him. Still another witness says that she concluded from the way Mrs. Jones spoke to her son that she had a preference for him. Mrs. Tucker says that she thought Mrs. Jones was afraid of her son. The reason she thought so was that it appeared that Mrs. Jones was afraid of displeasing him. She further says that she thought Mrs. Jones was hard on her daughter and that she was influenced by her son. She reached this conclusion from Mrs. Jones' actions and conversation. She also adds that she concluded that Mrs. Jones was afraid of her son because she never seemed to exert her opinion over him and agreed with everything he did that was not right.

It is the established doctrine in this state that, in order to show undue influence sufficient to invalidate a

will, it is not enough that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised, but some evidence must be adduced showing that such influence was actually exercised. Brent, et al. v. Fleming, 165 Ky. 365, 176 S. W. 1134; Crump v. Chenault, 154 Ky. 187, 156 S. W. 1053; Childer's Exor. v. Cartwright, 136 Ky. 505, 124 S. W. 804. And by evidence is meant something of substance and relevant consequence, and not vague, uncertain, or irrelevant matter not carrying the quality of proof, or having fitness to induce conviction. Brent, et al. v. Fleming, *supra;* Clark v. Young's Exor., 146 Ky. 377, 142 S. W. 1032.

It is also the rule that any reasonable influence obtained by acts of kindness, or by appeals to the feelings or understanding, and not destroying free agency, is not undue influence. But undue influence is such influence over the mind of the testatrix as destroys her free agency and constrains her to do against her will what she would otherwise refuse to do. Watson's Exor. v. Watson, 137 Ky. 25, 121 S. W. 626.

It may also be conceded that where testamentary incapacity is clearly established, but few circumstances, in addition to inequality in the distribution of the estate of the testatrix among the natural objects of her bounty, will be sufficient to take the case to the jury on the question of undue influence. Here no such case is presented. The testamentary capacity of the testatrix is not only shown, but admitted; and whether the will was obtained by undue influence exerted by the contestee over his mother is the sole question presented. In considering this question, we must bear in mind that there is not a syllable of proof tending to show that Edward Garr Jones ever requested or suggested the execution of the will in his favor, or that he ever knew prior to her death that such a will was even made by his mother. On the contrary, the uncontradicted evidence shows that the will was executed without his connivance or knowledge, and that he was not informed of the existence of the will until some time after his mother's death. Notwithstanding these well established facts, we are asked to say that the evidence of undue influence was sufficient to take the case to the jury. That evidence consists of alleged acts of cruelty on the part of Edward Garr Jones towards his sister and of alleged quarrels be-

tween them, occurring many years before the will was executed, and of expressions of opinion by certain witnesses that the testatrix was unduly influenced by her son. It is well settled that in a will contest based on undue influence, the conduct of a devisee, except in so far as it shows that he exerted undue influence over the testatrix, is not a proper subject of investigation. The only effect of such evidence is to introduce into the case collateral matters which throw no light upon the real issue and to excite prejudice in the minds of the jury. Here the issue was whether undue influence was used by the devisee to procure the execution of the will in 1914. Quarrels between the devisee and his sister, or acts of cruelty on his part towards her, occurring ten or twelve years before the will was executed, in no way elucidated that issue. Such evidence was not only of no probative value, but was clearly inadmissible. Phillips v. Phillips, 149 Ky. 206, 148 S. W. 59; Montgomery v. Morton, 143 Ky. 793, 137 S. W. 541; Simon v. Middleton, 112 S. W. (Texas) 441; Hughes v. Rader, 82 S. W. (Missouri) 32. Excluding this evidence, we find that the remainder of the evidence consists of mere opinions, not based on facts, but on prior inferences. Some of the witnesses say that the mother favored her son because she never criticised him, and that if she favored him she must have been influenced by him. Others conclude that the testatrix was afraid of her son because she never exerted her opinion over him, and that because she was afraid of him she must have been subject to his influence. An examination of their evidence will show that none of the witnesses ever testified to any facts tending to show that the testatrix on any particular occasion was ever improperly influenced by her son. In other words, their entire evidence consists of mere argument in which certain conclusions are adduced, not from facts, but from prior conclusions likewise unsupported by facts. While it is true that the evidence in will contests is necessarily permitted to take a wide range, we think the very frontier is reached when we pass the limits of the realm of fact and enter the field of surmise and conjecture. In our opinion, the evidence was wholly insufficient to take the case to the jury. Crump v. Chenault, *supra;* Hildreth v. Hildreth, 153 Ky. 597, 156 S. W. 144; Childer's Ex'r v. Cartwright, *supra;* Brent, et al. v. Fleming, *supra.*

Judgment reversed and cause remanded, with directions to give a peremptory instruction in favor of the defendant if the evidence on another trial be substantially the same.