## Cecil's Executors, et al. v. Anhier, et al.

(Decided June 8, 1917.)

### Appeal from Boyle Circuit Court.

1. Wills—Undue Influence.—The charge of undue influence over a testator must be established by satisfactory evidence. Undue influence cannot be presumed nor can it be sustained upon vague or uncertain evidence.

2. Wills—Undue Influence.—Where it is charged by the contestants of a will that the brother of the testator unduly influenced him in the execution of the will, but no evidence is adduced tending to show that the brother of the testator was present at the making of the will or codicil, or talked with testator concerning the manner of disposition of testator's property, or otherwise attempted to influence the disposition of the testator, the trial court should not have submitted the question of undue influence to the jury, even though it be shown in evidence that the testator and his brother were constant companions and that the testator relied upon and confided in his brother more than any other person.

3. Wills—Testamentary Capacity—Burden of Proof.—When the execution of a will has been duly proven by the propounders, the burden of showing that the testator lacked testamentary capacity, or that he was unduly influenced in the execution of the will, is upon the contestants, and where the testator is shown to be a man of physical vigor and strong mental qualities, and through many years was an active, aggressive and successful business man, the mere expression of opinions by non-expert witnesses on a trial of a contest of his will that he was of unsound mind at the time and before the making of the instrument, unsupported by other evidence, is not sufficient to support a verdict and judgment setting aside the will.

4. Wills—Testamentary Capacity—Undue Influence.—One possessing testamentary capacity and not unduly influenced, may dispose of his property by will in any way he pleases even though it does not accord with the views of the members of the jury as to right or justice, and appears to be unequal or unfair to the devisees.

5. Wills—Jury.—A jury will not be permitted to set aside or reform an otherwise valid will merely because it does not accord with their ideas of justice and propriety.

6.  Wills—Evidence—Reversal.—Where the overwhelming weight of
evidence in a trial of a will contest is in favor of the will, but
the jury finds the paper not to be the last will of the testator, the
judgment will be reversed even though it appear from the evidence
of two physicians with slight opportunities to observe the testator
or to know his actual state of mind, that he was suffering from
"involutional melancholia," and this be supported by the testi-
mony of several non-expert witnesses that testator was of unsound
mind.

BAGBY & HUGUELY, C. C. FOX, CHARLES H. RODES, HENRY
JACKSON, CLAUD MINOR, NELSON D. RODES and SAMUEL M.
WILSON for appellants.

ROBERT HARDING, ROBERT QUISENBERRY, JOHN W. RAW-
LINGS, GEORGE E. STONE, HENRY TAYLOR, EMMETT PURYEAR,
E. C. O'REAR, A. S. MOORE, J. P. HOBSON and CHARLES HOBSON
for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing,

This appeal involves the validity of a will.

In March, 1915, Granville Cecil, Sr., died a resident
of Boyle county, Kentucky, the owner and in possession
of an estate, consisting of lands and personal property
of the estimated value of more than two hundred thou-
sand dollars. He left surviving him a widow, Mrs. Emma
Talbott Cecil, from whom he had been separated for many
years, and three children, the oldest a son about forty
years of age, and two married daughters. At the time of
his death, Granville Cecil, Sr., was about sixty-five years
of age.

After his death, two papers appeared, one of date
June 7, 1902, purporting to be his will, and the other
bearing date January 31, 1911, purporting to be a codi-
cil to his will, and these instruments were offered for
probate in the Boyle county court as the last will and
testament of Cecil, and over the objection of the contest-
ants in this case, were admitted to record.

Granville Cecil, Sr., was the son of James Granville
Cecil, a young Virginian, who came across to Kentucky
and settled in Wayne county in the early part of the
nineteenth century. James Granville Cecil was a man
of unusual parts, and in the course of his life, by indus-
try, frugality and the exercise of business sagacity, accu-
mulated a large fortune and was able to leave to each of
his eight children property of the value of seventy-two
thousand dollars. This entire estate came from his own
efforts. Granville Cecil, Sr., started life with this for-

tune, which came from his father's estate. He was a strong, square-shouldered, heavy-built, robust, healthy man, jovial and happy. He had a host of friends with whom he associated and was on familiar terms, often engaging in joking and other fun-making conversation. A farmer by occupation, he was largely engaged in stock raising, especially horse breeding. He was very prosperous and made money rapidly. His brother, Charles P. Cecil, was his partner in the stock business, and they were constant companions and associates from their boyhood until his death. All went well with the deceased until his wife, Emma Talbott Cecil, sued him for divorce in December, 1896. This appears to have broken his spirits and to have brought him much grief and trouble. Immediately after the institution of the action, Cecil set about to procure a reconciliation. His wife laid down the terms. She required him to sell off certain horses, join the church and pay her twenty-five thousand dollars in a lump sum, and one thousand dollars annually during her natural life. He complied with each of these conditions, but she never returned to him. The daughters were associated more with their mother than their father, and, therefore, favored their mother in the family trouble and condemned their father. The youngest, Margaret, lived in the home with her mother several years before the daughter's marriage. The divorce proceedings were the beginning of Cecil's troubles. He lost weight and his health declined.

The will of date June 7, 1902, is in words and figures as follows:

"I, Granville Cecil, of Boyle County, Kentucky, do hereby make and publish this my last will and testament hereby revoking any and all testamentary papers that may have been heretofore made by me.

"First: I desire and direct all my just debts and funeral expenses to be promptly paid by my executors hereinafter named.

"Second: Under a deed of settlement made between me and my wife, Emma T. Cecil, of date 7th day of Jan. 1897, and of record in the Boyle County Clerk's office in Deed Book 25, page 118 to 123, my said wife has relinquished and released all right, title and interest in my entire estate and in addition she has deeded to me all her right, title and interest in and to the farm of some three hundred and twenty-two acres in Boyle County, Kentucky, known as Melrose. I desire my said settlement

with my said wife to be complied with strictly according to the terms of same in the same manner as if I were living, nothing more to be paid her than the settlement calls for.

"Third: I value my farm of about three hundred and twenty-two acres on the East side of the pike leading from Danville to Harrodsburg, and known as Melrose, at Thirty Thousand Dollars ($30,000.00). By a deed of trust to C. P. Cecil of date June 7, 1902, I have made an advancement of Eleven Thousand One Hundred and Twenty Nine & 75/100 Dollars ($11,129.75) to Bessie C. DeLong, my daughter, in lieu of her share in the aforesaid farm, known as Melrose, to the extent of the sum so advanced. I therefore direct that my two other children, James Granville Cecil and Margaret W. Cecil, shall be exclusive beneficiaries in Melrose under the terms of this will to the extent of $11,129.75 each, so that said James Granville Cecil and Margaret W. Cecil shall be the exclusive beneficiaries of Melrose to the extent of $22,259.50, but my three children, Bessie C. DeLong, James Granville Cecil and Margaret W. Cecil, shall be equal beneficiaries in the remaining value of Melrose, to-wit: $7,740.50, and the net income of Melrose shall be apportioned to my said three children upon the basis above indicated. In all the rest and residue of my estate of every kind my said three children shall be equal beneficiaries upon the terms of this will.

"Fourth: Acting under deed of gift from my father, James G. Cecil, to my sister, Sarah Cecil, I now appoint my brother Charles P. Cecil, as trustee of Sarah Cecil in my name and stead.

"Fifth: I direct my executors and trustees hereinafter named and appointed to close and settle the partnership between me and my brother, Charles P. Cecil, known under the firm name of G. & C. P. Cecil, as soon after my death as practicable. My brother C. P. Cecil, shall have a perfect right to bid on any of the partnership stock when same is put up for sale and the fact that he is my executor shall not prevent him from bidding for and buying any of the stock he may see fit to purchase.

"Sixth: My executors and trustees have the privilege of selling my undivided one-half interest in certain real estate in the town of Danville and adjacent to the lands owned by John Fogarty and others and used by G. & C. P. Cecil in our partnership business, at any time they think advisable so to do, and I hereby give them

full power and authority to make sale of same and conveyance of same. No sale however is to be made of my Salt River farm in Boyle County, containing about 900 acres of land, nor of Melrose, until all of my children are dead, and if they or any of them leave children surviving them after all of my said children are dead then said two farms shall not be sold until my youngest grandchild reaches the age of 21 years.

"Seventh: I hereby appoint my brother, Charles P. Cecil, and my friend, John W. Yerkes, executors and trustees of this will and now devise and bequeath to them my entire estate, real, personal and mixed, in possession, and remainder and reversion, and where ever situated, for the purpose and upon the trusts herein indicated.

"I give them full power and authority to sell, convey, and reconvey at their discretion any real estate which I may own or which they may purchase, saving and excepting Melrose and the Salt River lands heretofore mentioned.

"I give them full power and authority to sell, transfer and deliver any or all of my stocks, bonds, securities, and personal property of every kind, and full power and authority to invest and reinvest from time to time, the proceeds of such sales in other stocks, bonds, securities, lands, or improved real estate, situated in this State, or to loan same.

"But at the expiration of ten years after my death, my said executors and trustees are to make sale of all stocks, bonds and securities of every kind, and all personal property which they may hold under this trust at said time and to collect all loans and to invest all of same in real estate in the County of Boyle or adjacent Counties with the privilege, however, to said trustees to sell and convey at any time any portion of the real estate so purchased by them but the proceeds of sale to be reinvested in other real estate in said County of Boyle or other Counties in Central Kentucky.

"Whenever sales are made by my said trustees, the title shall pass, and the purchaser need not look to the application of the purchase money. It is my will and I give to my said trustees all power and authority, which may be necessary and proper to carry out the purpose and trust as herein indicated, and I do not desire that they be required to give bond with security either as executors or trustees, and my said executors and trus-

tees are not to be responsible for any loss resulting to this estate, on account of accident, or error in judgment in any sales, purchases, investments or reinvestments, as herein provided.

"My said executors and trustees are authorized and empowered and directed to manage this estate now bequeathed and devised to them in such way as may seem to them to redound to the best interests of my said children and their issues, and thereby grant to them ample and full discretionary powers and control to dispose of my estate and to make profit, earning, increase and income for the benefit thereof in the same way and as fully as I could lawfully do if I were living, subject to the express provisions of this will. They shall pay to each of my said three children, James Granville Cecil, Bessie C. DeLong and Margaret W. Cecil, for their use and benefit, and annually or half-yearly, such sum or sums as they deem proper for the support of each. Except that they shall not pay to Margaret W. Cecil, so long as she remains single, until she reaches the age of 30 years, more than $700.00 per year, the amount she now receives, or may receive, for her support. The balance of the net income arising each year for her benefit under the terms of this will, after the payment of said sum of $700.00 shall be kept in a separate fund, and managed by my executors and trustees, loaned out or invested in such securities as they deem safe but strictly kept together with its accretions within the operation of this will and as a part of the trust hereby created.

"They shall not pay to any one of said children more than one third of the net income arising from the estate hereby bequeathed, exclusive of Melrose, and no more than their proportionate part of the net income of Melrose upon the basis hereinbefore indicated. It must be understood that my said three children are equal beneficiaries, in the net income accruing from my estate herein devised except as hereinbefore stated as to Melrose, but by this the executors and trustees of my estate are not required necessarily to pay to each child his or her full share of the net income unless they see fit to do so but they must keep a strict account with each child and whatever portion of his or her net income is not paid out as aforesaid shall be held under the full operation of the terms of this will and as a part of the trust estate hereby created and strictly in trust, but to the credit of said child.

"Neither- of my said children shall have any power or right to sell or encumber any part of my said estate in the hands of my said executors, or the principal or income thereof or to anticipate the receipts thereof, nor shall my said estate or any part thereof be in any way liable for the debts, engagements or contracts of either of them, but every part thereof shall be held by my executors in trust for my said children and their issue and to make profit increase and earning for their benefit and shall remain in trust as to the share of each and no part to be paid them beyond the net income at any time, and shall remain undivided and continue in trust during the life of the longest liver of them, and if any of their children survive the said longest liver of them, my said estate shall continue in trust with all the provisions of this will in full force and effect until my youngest grandchild reaches the age of 21 years. In no event shall this trust cease until the death of the longest liver of my said children. If my said children should die without children or descendants surviving them, then my brother, Charles P. Cecil, shall inherit all my estate in absolute fee simple title, or if after the death of all my said children, all of their children and descendants should die before my youngest grandchild reaches the age of 21 years, my said brother Charles P. Cecil, shall inherit all my estate, and if he be dead upon the happening of either of the two contingencies last named, my entire estate shall vest absolutely in his estate, and come under the provisions of his last will and testament, or if he have no will it shall be distributed among his heirs according to the law of descent and distribution then prevailing in Kentucky. If, however, my youngest grandchild lives to be 21 years of age, this trust shall then cease and the trust estate shall be divided among the descendants of my children according to the Statutes of Descent and Distribution as then existing in the State of Kentucky.

"If during the continuance of this trust, any one or all of my children should die leaving descendants, then my executors and trustees shall use that portion of the net income of this estate which they would have used for the benefit of the deceased child or children, for their descendants, if any survive the deceased child.

"I desire my executors and trustees to keep the cemetery lot in the cemetery in Danville, Ky., in which lot my father and mother, brothers, nephew and child are buried, in good neat order and condition during the

existence of this trust. At the expiration and final distribution of this trust, I direct $250.00 to be paid to the trustees of the Danville Cemetery, to be held by them as a perpetual fund, in the income of same or so much as necessary to be expended in keeping said lot and the tombstones and monuments on same in good condition, and in neat order.

"The semi-annual allowance made to my wife, Emma T. Cecil, under the settlement hereinbefore referred to shall be paid by my trustees and executors out of the gross income of my estate before any payment is made to any of my aforesaid children.

"The semi-annual allowance made to my daughter Margaret W. Cecil, by said settlement, shall be paid out of her share of the net income of my estate, and nothing more shall be paid to her out of my estate than said settlement calls for until she marries or reaches the age of 30 years. The provision hereinbefore made as to Margaret is intended to carry out the provisions of said settlement and shall not be construed as an additional allowance to her beyond the amount allowed by said settlement.

"In case, from any cause whatever, the interest or share of Margaret in the net income of my estate arising for any year should be insufficient to pay the allowance for said year under said settlement, then said allowance shall nevertheless be paid in full, but whatever deficiency in the shares of my other children shall be caused thereby shall be charged strictly to Margaret, and when she marries all her interest in my estate shall cease until she settles with my estate and pays to my estate out of her share in its net income or otherwise, any and all deficiencies as aforesaid with 6 per cent. interest from the time they arise until paid.

"It is my earnest desire that my children be frugal and economical and of good and economical habits and that my estate increase in the hands of my trustees and executors each and every year, and if my children become extravagant in their living and if my son Granville have any bad and immoral habits, I desire my trustees and executors to reduce the amount or amounts of their allowances, or they may, if they deem proper, in case of the contingency or contingencies just named, deprive them or any one of them of any allowances whatever, and pay the allowances to their families and children or so much as they deem advisable.

"All my landed estate devised to my executors and trustees and all landed estate coming into their hands hereafter shall be kept in a good and high state of cultivation and fertility and sown in grass when necessary and they shall keep all fencing and improvements in good repair and keep the buildings of value reasonably insured, and keep all taxes paid. All expenses for these purposes are to be paid out of the gross income of my estate. Said expenses for 'Melrose' are to be kept in a separate account and paid out of the gross income of Melrose exclusively, with a view to the distribution of the benefits of the net income of Melrose as hereinbefore directed.

"If any creditor of any one or all of my children or of any one or all of their descendants who may become beneficiaries of this trust shall, by judicial process, attempt to subject the interest or interests of any one or all of my said children and their descendants, beneficiaries under this trust, then in that event they or any one of them whose interest is sought to be thus subjected shall be divested of all right, title and interest in my estate or the income thereof. It being my express purpose to divest each and every one of said beneficiaries of any interest whatever in my estate or the income thereof whenever any creditor seeks by judicial process to subject the interest of such beneficiary or beneficiaries or any part of same to the payment of any debt.

"My executors and trustees shall have the discretionary power, however, to make appropriations out of my estate to provide the ordinary comforts of life for any of my said children or descendants, whose interests may have become divested as aforesaid but this power is left purely to their discretion as to whether they will exercise it or not. In no event shall they so appropriate more than any beneficiaries proportionate part.

"The savings and increase of my estate each year resulting from payment to any or all of my children or descendants, or less than their proportionate part of the net income shall become a part of the principal of my estate and come under the full operation of all terms and provisions of this will at the end of each year and be handled, invested and reinvested as the principal of my estate. This clause shall not impair the operation of the clause directing my executors and trustees to invest all my estate in real estate after ten years. They shall have the right after the lapse of ten years to in-

vest small accretions as they arise in loans and securities using their discretions as to the character of same, until the accretions become large enough to invest in real estate, but I desire the investment in real estate as soon as possible, as I prefer that form of investment wherever practicable.

"In the event that my friend, J. W. Yerkes, fails to qualify as my executor and trustee, I give my brother, Chas. P. Cecil, full power and authority to nominate and choose another trustee and executor in the place and stead of said J. W. Yerkes. I desire and direct that there shall always be two executors and trustees of my estate as long as this trust shall exist, and I give my said brother, Charles P. Cecil, full power to fill all vacancies that may occur in the executorship and trusteeship of this estate, during his lifetime. He shall make said appointments by instrument of writing signed and acknowledged by him as deeds are required to be signed and acknowledged in this State, and said instrument shall be recorded as deeds are required to be recorded by the law of this State. He may nominate his own successors as executor and trustee of this estate by last will and testament.

"He shall have power to fill the vacancies as aforesaid without requiring the appointees to execute bond if he sees fit so to do; but any and every executor and trustee of my estate not selected by him as aforesaid shall be required to give bond with good and sufficient security.

"Witness my hand hereto signed this June 7, 1902.
                              " GRANVILLE CECIL.

"This will was this day signed and acknowledged by Granville Cecil in our presence, and by his request and in his presence and in the presence of each other we do now sign our names thereto as attesting and subscribing witnesses:
"This June 7th, 1902.
          "J. C. CALDWELL,
          "J. A. PRALL, JR."

The codicil of date January 31, 1911, is as follows:

"I, Granville Cecil, of Boyle County, Kentucky, being of sound mind and memory, do hereby make and declare the following as a codicil to my will dated June 7th, 1902.

"My friend, Hon. Jno. W. Yerkes, is now a resident of Washington City, and on that account I hereby nominate and appoint C. C. Bagby as executor and trustee of my aforesaid will in lieu of the said John W. Yerkes, to act with my brother, Charles P. Cecil, in those capacities. And they shall have the same powers and duties as was given to my executors and trustees in my said original will.

"Since the date of my will, I have made other advancements to my daughter, Bessie C. DeLong, and the total advancements to her from my estate amount to the sum of about seventeen thousand five hundred dollars ($17,500.00), and since the date of said will my son, James Granville Cecil, has made many improvements on my farm described in said will as Melrose, for the purpose of equalizing my children, James Granville Cecil, and taking into consideration the said advancements to the said Bessie C. DeLong and the said improvements on said Melrose made by my son, James Granville Cecil, I hereby give, devise and bequeath my said farm, Melrose, of about three hundred and twenty-two (322) acres on the east side of the Danville and Harrodsburg turnpike in Boyle County, Kentucky, unto my said son, James Granville Cecil and my daughter, Margaret Cecil Embry, four-sevenths of same to said James Granville Cecil, and three-sevenths to my said daughter, to be held in trust for them however, by my trustees for and during the natural life of the said James Granville Cecil and the natural life of the said Margaret Cecil Embry, and at their death to continue in trust for the use and benefit of their children until the youngest child of each shall reach the age of twenty-one years, at which time the said share in Melrose devised to said James Granville Cecil shall vest absolutely in his descendants and the share devised to said Margaret Cecil Embry shall vest absolutely in her descendants.

"The management and operation and conduct of the estate so devised shall in all respects come under the operation of the trust created in my original will.

"The share devised to my said daughter, Margaret Cecil Embry shall be free and exempt from the courtesy interest or any interest whatever of any husband she has or may have. The share in said real estate devised to my son, Granville, is devised upon the express condition that his wife, Rebecca Thomas Cecil, shall have the dower interest fixed by the laws of Kentucky, which

dower interest, however, shall cease in the event she remarries after the death of my son, James Granville Cecil.

"I deem the provisions herein made to be a just and fair equalization between my three children, and all the rest and residue of my property of every kind shall equally vest in them under the terms of my aforesaid original will, subject to all of its conditions and provisos, and under the full operation of the trust created therein.

My said original will is hereby ratified in every regard except as to the changes hereinbefore expressly made, and except that it is my will that the real estate devised in said original will, and all of same, shall vest as provided in said will, in my daughters, Bessie C. De Long and Margaret Cecil Embry, free from any courtesy interest or any interest of any husbands they have or may hereafter have. The real estate devised in said will to my said son, James Granville Cecil, shall vest in him with full dower rights provided by the law of Kentucky as to his wife, Rebecca Thomas Cecil, except that said rights shall cease in the event of her remarriage after the death of my said son, James Granville.

"Witness my hand this January 31, 1911.

" GRANVILLE CECIL.

"Witnesses:
"CHENAULT HUGUELY,
"JNO. C. BOGLE."

When these instruments were admitted to record in the county court, the widow, Mrs. Emma T. Cecil, and the three children, James Granville Cecil, Jr., Mrs. Bessie Anhier and Mrs. Margaret Embry, and certain other relatives instituted this contest to set aside the will. About three weeks were consumed in the trial of the case in the Boyle circuit court, where the propounders of the will introduced more than sixty witnesses, some of them testifying at great length, and the contestants introduced more than twenty witnesses, whose testimony covered the whole life of testator. The jury, under instructions from the trial court, returned a verdict finding the two instruments, the will and codicil above copied, not to be the will of Granville Cecil. Judgment was thereupon entered, declaring the two instruments not to be the last will and testament of Granville Cecil, Sr., and certifying the fact to the probate court. From this judgment the propounders of the will appeal to this court.

The contestants rely upon two grounds only for the breaking of the will.

1st: Testamentary incapacity; and,

2nd: Undue influence exerted over the testator.

The contention of contestants is: That the testimony thoroughly established that the testator, Granville Cecil, did not, at the time of making and executing either of the papers, have mind and memory sufficient to know the natural objects of his bounty and his duty to them, and that the testimony establishes as a fact that the testator, Granville Cecil, was a miser, that he had an unnatural and unreasonable and insatiate love of money, that if there was anything he loved and worshipped it was the almighty dollar, and that this unholy and insatiate love of money destroyed apparently the instincts of the father, and his father's appreciation and sympathy for his children, and for that reason, at the time of the execution of the papers in contest, he did not and could not know and understand or appreciate his duty to the natural objects of his bounty.

To prove want of capacity to execute the will in contest, the daughters of the testator were called and testified that their father, the testator, on numerous occasions had used abusive language to them and had cursed, calling them "spendthrifts" and "damn fools" for spending their money and creating debts. These two daughters expressed the opinion that their father was of unsound mind at the time of the making of the will and codicil. It was also shown that the son, James Granville Cecil, Jr., while undergoing treatment at a sanitarium in Indiana, had been called "a spendthrift," "loafer" and "fool" by his father. The widow, Mrs. Emma T. Cecil, testified that the testator during their married life was a grasping, money-loving, hard-hearted and stubborn husband, from whom it was difficult to wrench money; that he was always engaged in the pursuit of money, industriously working, trading and hustling not alone to conserve the large estate left him by his father, but to accumulate a fortune on his own account. She thought her husband of unsound mind. The testimony of the two daughters and the widow display much bitterness of feeling towards the testator. They seemed to strive with each other in an effort to heap opprobrium upon the father and to blacken his memory. In the settlement of the divorce suit the father agreed to pay five hundred dollars, per year, for the support

and maintenance of the youngest daughter, Margaret, until she arrived at the age of thirteen, and then six hundred dollars per year, until she arrived at the age of sixteen; and then seven hundred dollars per year, until she married or arrived at the age of thirty years. These sums were all paid. The oldest daughter, Mrs. Anheir, married Will DeLong, a rich young Kentuckian, previous to the separation of the father and mother, and no provision, therefore, was made, or was necessary, under the settlement for her support.

The son, James Granville Cecil, was allowed the use of the fine home farm of the father for many years, almost without reservation of rent. The income from this farm, under proper management, was large.

In addition to the evidence of the members of the family of the testator, Dr. Green, of Martinsville, Indiana, and Dr. Runnalds, of Indianapolis, testified with reference to the mental status of the testator. Dr. Green had known Granville Cecil, Sr., for twenty-eight or thirty years, having treated him for nine or ten days in 1888 or 1889 for constipation. In 1896, or 1897, the doctor saw Mr. Cecil, and in 1911 Dr. Green again saw Mr. Cecil, but for only a few hours. Dr. Green had no close personal acquaintance with the testator, but it was the annual habit of the testator to visit the sanitarium at Martinsville to take baths, and it was in this way that the doctor knew him. It also appears that Dr. Green upon one occasion visited the home of the testator in Boyle county and talked with him for a few minutes. The doctor testified that Mr. Cecil's conversation chiefly related to the extravagance of his family and the wasting of money, and in this connection Cecil had insisted that he could not afford to keep certain members of his family in the sanitarium under treatment, because it would break him up. The doctor related several different conversations had with the testator with reference to these matters, and stated that Cecil was suffering from "involutional melancholia," which, he said, was a disease of the mind superinduced by many conditions, some of which are worry, annoyance, toxemia, arterial changes, kidney conditions, and reflex conditions such as tumors pressing upon a nerve trunk; calcium in little vessels in the brain. "A thousand things that produce it." Continuing, the doctor testified as follows: "I never made an analysis of his case to know where the source of trouble came from,

other than back twenty-eight years ago, or thirty years ago, there was the presence of albumen in his urine.''

Dr. Runnalds had charge of the institution to whioh James Granville Cecil, the son, was taken for treatment, and perhaps an operation, and he testifies that the father, Granville Cecil, Sr., came to his institution in 1910 or 1911, and talked with him concerning his son; that on one or more occasions the father and son got into conversation about the expenses incurred and being incurred by the son. The doctor referred to it as ''a wrangle between the father and son.'' The doctor was asked this question:

''Q. Could you recall what that wrangle occurred over, whether it occurred over property or not? A. Well, it was costing too much money, and he did not need it anyway; he was lazy and it was all unnecessary, and he wanted him to get out of this: get back to business.''

He further testified that Granville Cecil, Sr., remained at the institution two or three weeks, and the doctor talked with him frequently. From these facts the doctor expressed the opinion that Granville Cecil was, at that time, of unsound mind. The conversations with Granville Cecil, Sr., detailed by the doctor, and the acts which he ascribes to the testator, considered in the light of all the surrounding circumstances, do not sustain the conclusion reached by the doctor. In fact, the testimony of Dr. Green and Dr. Runnalds, when read and considered as a whole, does not at all convince the mind that Granville Cecil, Sr., was at the times of which they speak diseased in mind to such an extent as to be incapacitated to make a will. In fact, his acts, conversations and conduct appeared quite natural and therefore rational. The doctors were anxious to have Mr. Cecil and his family remain at their institutions. This was quite natural on the part of the doctors, but to do so, was very expensive to Mr. Cecil, and of this he complained bitterly. However, he usually paid the bills. Sometimes he cursed and swore about the expenses and declared that it was breaking him up and that he and his family would come to the poor house, but it would end by his paying the bills.

Dr. J. L. Slaven was called by the contestants, and asked concerning the mind of testator, and he expressed the opinion that it was bad in 1910, on an occasion when he had a brief conversation with him. Dr. Slaven is an osteopathic physician, but did not treat Mr. Cecil, nor was he closely associated with him. On one occasion he had

a conversation lasting three or four minutes, in which Cecil speaking of his son said: "He is full of pure, undefiled laziness and ought to be sent to the farm and put to work." It is the opinion of Dr. Slaven that Mr. Cecil was of unsound mind, else he would not have spoken so of his son.

Several laymen were then called and asked to express an opinion as to the sanity of Cecil, and each gave it as his opinion that Cecil was of unsound mind. To this evidence objection was made, but, it is a well-established rule in Kentucky that non-expert witnesses, having an opportunity to observe the conduct of a testator, may give their opinion as to his mental capacity, the weight and value of such opinions being for the jury. Murphy's Ex'ors v. Murphy, 146 Ky. 399; Newcomb, &c., Ex'ors v. Newcomb, 96 Ky. 120; Wise v. Wise, 81 Ky. 10.

Such evidence is not of the highest probative character, but in cases where the association and observation of the witness have been close and continuous for many years, it will greatly aid in arriving at the true mental condition of the testator.

Several of these non-expert witnesses introduced by contestants, had an opportunity for close observation and association with the testator for some years next before his death. Especially is this true of Mr. Harris, who traveled with Mr. Cecil from Danville, Kentucky, to Spencer, Indiana, on the occasion of the attempted reconciliation between Cecil and his wife after the commencement of the divorce suit. In addition to telling the conversation and conduct of the testator on the trip to see his wife, at Spencer, Indiana, Mr. Harris tells of a church subscription of one thousand dollars, which he says Mr. Cecil made and afterwards declined to pay. It is the opinion of Mr. Harris that the testator was of unsound mind at the time mentioned and for several years before his death.

Upon the other side, the propounders introduced Mr. C. C. Bagby, the lawyer who prepared the will and codicil in contest, and he testified:

"I know I spent some two or three weeks writing the will, at different times, different parts of the day, with him, and some other papers that he was preparing at the same time."

And continuing, the witness said:

"Well, he said that he wanted me to write a will for him, and that he wanted to put his property in trust

for his children and his grandchildren, and he spoke of his property, and what he had; I can recall that he spoke of his farm on Salt river and told me how—about what size farm it was, and he also spoke of a place called Melrose, and then he discussed, I think, at some length his idea about how he wanted the property placed in trust, as I have said.''

In speaking of the original will drafted by Mr. Yerkes, the witness said: ·

''He (Cecil) would mark out the parts that he didn't expect to incorporate in this will and leave the parts that he wanted to refer to and use in writing this will. He had that will while this will, as I say, was being written, and he would mark out the parts that he wanted—didn't want in this will, and the parts where he wanted to make changes, and then he would make some notations on that old will.''

When asked his opinion as to the mental condition of Mr. Cecil at the time of the making of the will, Mr. Bagby answered:

''He was of sound mind. His mind was perfectly clear.''

''Q. I will ask you to tell the jury whether at the time he executed this paper, on the 7th day of June, 1902, he had, in your judgment, mind and memory enough to know his estate, the extent and value of it, nature of it? A. He did. · Q. Did he have mind and memory enough, in your opinion, to take a rational survey of his estate at that time? A. He did. Q. Did he have mind and memory enough to know his children and grandchildren, the natural objects of his bounty, at that time? A. Yes, sir, he did. Q. Did he express a purpose as to how he wished to dispose of his estate? A. He did. Q. Did he have mind and memory enough at the time this will was executed to know and appreciate his obligations and duties to the natural objects of his bounty? A. He had. Q. I will ask you whether, from the time he first talked with you on the subject of drawing this will, down to the time that the will was actually signed and executed, whether his purpose in reference to the disposition of his estate was changed? A. No, never at any time.'' While considering the drafting of the codicil with his lawyer Mr. Cecil said, ''He wanted to give little Granville a little more interest in Melrose and—a little larger interest in Melrose, and Margaret a little larger interest in Melrose, I believe, on account of some advancements that he had made to

Mrs. DeLong, and I think he mentioned, too, that Granville maybe had made some improvements on Melrose—I cannot be perfectly sure about that, but he mentioned these other things and said he wanted to make a change as to Melrose, and then he told me he wanted to make Granville's interest in it four-sevenths, and Margaret's three-sevenths, and said that he wanted to—wanted Mrs. Rebecca Cecil to have an interest in it in case little Granville died so that she could stay there and have an interest in the place and wanted her to have a dower interest in it.''

Testifying further, Mr. Bagby said: ''His (Cecil's) mind was sound when the codicil was made.''

''Yes, sir, yes, he knew his estate.''

''I saw a great deal of him. He was at the office very frequently on business. Talked with him a great deal.''

''Q. I will get you to tell the jury what was his condition of mind from the time the will of 1902 was executed down to the time this will or codicil of 1911 was executed? A. His mind was sound.''

All the living witnesses who attested the will and codicil now in contest also testified that testator at the making of those instruments as well as at all other times, was of sound and disposing mind and memory, and in their opinion had sufficient mind to know the nature, character and value of his property, the objects of his bounty, his duty to them, and that he understood the contents of the instrument which he signed and to whom he was giving his property.

Dr. Jackson, a physician of thirteen years' experience, residing in Danville, Kentucky, the home of the testator, was also called. Dr. Jackson treated Granville Cecil, Sr., on one or more occasions previous to his final illness, which brought on his death, and testified that Cecil was at all times, except immediately before his death, in March, 1915, of sound mind; that he did not suffer from ''involutional melancholia,'' but on the contrary was a man of strong mind and will, in every way competent to manage, control and dispose of his estate; that when the mind is once affected by involutional melancholia, it is never completely eradicated, but will be manifest in after life, and that had Granville Cecil, Sr., suffered from this disease at the time spoken of by Drs. Green and Runnalds, there would have been traces of it in 1915, at the time Dr. Jackson treated Cecil, and from

this Dr. Jackson concludes that Mr. Cecil was never, in fact, so afflicted.

Dr. J. R. Cowan, a graduate of Harvard University, and a practicing physician of several years' experience in Danville, Kentucky, was also called and testified that he had known Mr. Cecil for many years, and had treated him on several different occasions in 1912, and up to his death in 1915. When asked to give his opinion as to the mental condition of Granville Cecil, Sr., he answered: "I saw nothing in his mental condition to arouse any suspicion of unsound mind." In testifying further, he stated, that he did not make any examination of Mr. Cecil to find out his mental condition, but that he did not observe anything indicating a mental derangement, or that Cecil was suffering from involutional melancholia.

Some sixty non-expert witnesses, both men and women, including ministers, lawyers, bankers, farmers, mechanics, professors, merchants and other business and professional men in and around Danville, Kentucky, who had associated with Granville Cecil, Sr., in business and social affairs, were called by the propounders to testify with reference to the mental condition of Granville Cecil, at the time and before the making of the will and codicil in contest, and each one of them gave it as his or her opinion that the testator was of sound mind throughout his entire life. They related many circumstances indicating a strength of mind and will power seldom surpassed anywhere. Some of these witnesses have known the testator for forty or fifty years, many others from ten to thirty years, and had been intimately associated with him. The Hon. John W. Yerkes, in testifying with reference to the mental capacity of his life-long friend, Cecil, said, in answer to the question, "What was his (Cecil's) condition of mind on that trip down to Tatham Springs?" Answer, "Perfect."

"Q. Were you with him in after years, after that trip to Tatham Springs? A. Oh, we would meet in the bank, or we would meet in the store that Will Rowland was in, or we would be sometimes in Charlie Cecil's store, or on the street, sometimes out at Charles Cecil's house; met him around just as I used to meet him. Q. Now, coming down to the year 1914, when you speak of having met him and encountered him at various times and talked with him, what was his mental condition at that time? A. As far as I could see, perfect; never saw him when he was otherwise in my life. Q. Mr. Yerkes, from the time

you first knew Mr. Granville Cecil in early boyhood, on down to your last meeting with him in 1914, will you please tell this jury whether or not he was a man of sound mind? A. Absolutely so and always. Q. Did Mr. Cecil, in your judgment, in 1893 (the date of first will) have mind and memory enough to know his estate, the character and extent and value of it, and would take a rational survey of it? A. He did. Q. Did he have that capacity in 1897 (date of first codicil)? A. He did. Q. Did he have it in 1902 (date of will in contest)? A. He did. Q. Did he have it in 1911 (date of codicil in contest). A. He did. Q. Did he have it the last time you saw him (1914)? A. He did."

In answer to a question as to whether he knew Mr. Cecil, Mr. Yerkes said, "I knew him perhaps as intimately as one man ever knows another."

"Q. When did that acquaintance begin? A. Began in boyhood, became intensified after I began the practice of law, and continued until his death. Q. Were you ever employed by him in your professional capacity? A. From the time I commenced practicing law until I left Danville, I think I represented him in virtually all his business matters, and after I left here, during the fourteen years that he lived, I was back in Danville more or less frequently, sometimes once, sometimes twice, sometimes more frequently a year. I always saw him; one occasion we went off together to the springs for a couple of weeks for his health and mine; and corresponded occasionally; so that our friendship and intimacy was unbroken, although our business relations, of course, virtually ceased after I left here. Q. Will you tell the jury how he lived? A. I never knew of any man in my whole life who spent more money on his family and less on himself; he always lived well, I mean in his home and in his place at Salt River, in the days that I was there. I was not at Salt River, I don't think, after I removed to Washington; when I came back here, I don't think I ever went to Salt River. His table was certainly—and Mrs. Cecil was a very delightful housekeeper—his table was everything that you could find on the table of anyone; his house was certainly well furnished, as far as I could see; there was always an abundance of servants. If there was anything about his house other than that of a well-to-do, comfortably living man, I don't know it—don't remember now. Q. What was his demeanor towards his wife and children? A. I never saw anything as between

them that indicated anything but what was proper. I don't think any man cared more for his family—I am speaking of this as a fact—I don't think any man I ever knew, as far as I could judge, cared more for his children than he.''

Several of his grandchildren testify to acts of kindness and manifestations of tender devotion on the part of the testator; how he remembered them at Christmas time and birthdays with gifts. He also advised them concerning their course in life and in every instance it was sound and such as became a grandfather.

It is the consensus of this testimony that Granville Cecil, Sr., was a man of strong physical and mental qualities, capable not only of taking care of his affairs in a reasonable way and of disposing of his property by will, but thoroughly understanding and appreciating the natural objects of his bounty, and his duty to them.

The charge of undue influence is based upon the close association and confidence which existed between Granville Cecil, Sr., and his brother, Charles P. Cecil. It is contended that Charles P. Cecil, being an astute business man, had influenced his brother to make him trustee of the estate under the will, thus empowering him to manage and control the estate to the detriment of the children and grandchildren of testator. The grandchildren, however, are not complaining of the will, but are attempting to sustain it. Moreover, the evidence shows that Charles P. Cecil was not present at the making of the will or codicil and there is a total absence of testimony showing or tending to show that Charles P. Cecil, influenced or attempted to influence his brother in the disposition of his property, or even talked to him on that subject. There is some testimony, however, that Charles P. Cecil possessed the opinion that his nieces and nephew, children of Granville Cecil, Sr., mentioned in the will, were and are impecunious and improvident persons likely to squander any estate which came into their hands. Undue influence must, like other facts, be supported by evidence. It cannot be presumed. Every presumption is indulged in favor of the will.

''It is the established doctrine in this state, that in order to show undue influence sufficient to invalidate a will, it is not enough that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised, but some evidence must be adduced showing that such influence was actually exercised.

Brent, et al. v. Fleming, 165 Ky. 365, 176 S. W. 1134; Crump v. Chenault, 154 Ky. 187, S. W. 1053; Child's Exor. v. Cartwright, 136 Ky. 505, 124 S. W. 804. And by evidence is meant something of substance and relevant consequence, and not vague, uncertain, or irrelevant matter not carrying the quality of proof, or having fitness to induce conviction. Brent, et al. v. Fleming, *supra;* Clark v. Young's Exor., 146 Ky. 377, 142 S. W. 1032." Jones v. Beckley, 173 Ky. 840.

"Undue influence is any influence obtained over the mind of the testator to such an extent as to destroy his free agency and to constrain him to do against his will what he would otherwise refuse to do, whether exerted at one time or another, directly or indirectly, if it so operated upon his mind at the time he executed the paper. But any reasonable influence obtained by acts of kindness or by appeals to the feelings or understanding, and not destroying free agency, is not undue influence. Turley v. Johnson, 1 Bush 117; Broaddus v. Broaddus, 10 Bush 299; Bush v. Lisle, 89 Ky. 393, 12 S. W. 762; 11 Ky. Law Rep. 708; Watson's Exr. v. Watson, 137 Ky. 33."

"Influence obtained by modest persuasion and arguments addressed to the understanding, or by mere appeals to the affections, cannot be properly termed undue influence in a legal sense." Wise, &c., v. Foote, &c., 21 Ky. 15.

It may be stated here that there is not the slightest evidence in the record conducing to show that the will or codicil or any provision thereof, was brought about or induced by undue influence on the part of Charles P. Cecil, or another, and this being true, it was error on the part of the trial court to submit the question of undue influence to the jury.

"Testamentary capacity is a question of fact, but the standard of testamentary capacity is a question of law for the court." 40 Cyc. 1331. The soundness of mind required in the execution of a will does not necessarily reach that strength of mind which will enable a man to fairly contract with another at arm's length or traffic in property and manage it advantageously, but the capacity required to render a man mentally competent to make a will exist when the testator has will, mind and memory to sufficiently understand that he is selecting the person, or persons, whom he wishes to have his property, and to know his property and the natural objects of his bounty, and his duty to them, and to the persons upon whom his

property is bestowed by the testamentary paper, which he signs, and to make such disposition in accordance with a then settled purpose of his own.

Meuth's Executrix v. Meuth, et al., 157 Ky. 784; Shirley, &c., v. Shirley's Exr., &c., 81 Ky. 240.

It is not seriously insisted by the appellees that the testator did not have mind and memory sufficient to understand the nature and value of his property and to know the person upon whom he was bestowing it, and to understand and appreciate the contents of the testamentary paper, which he signed, but they do insist that while he knew the objects of his bounty, he was a mental delinquent and moral degenerate, and did not appreciate or understand his duty to the objects of that bounty, and they rely chiefly upon the case of McDonald's Exors., &c., v. McDonald, 120 Ky. 215. But that case is easily distinguishable from this one. The facts were very different. McDonald seemed to hate and despise his children, the natural objects of his bounty. He wished he could take his property with him when he died, or leave it so encumbered that his children would have to work like dogs in order to save it from sale under execution. In this case the testator, Cecil, while a strong, severe and exacting father and husband, was ever on the alert to preserve his estate for the use and benefit of his children. He realized that they were not good financiers and their ventures, both in business and social affairs, had resulted disastrously in every instance. His daughters had married over his objection (chiefly on account of their tender years), and their marriages were unhappy. Bessie, the older one, married a young man of wealth, and in two or three years the two had squandered the estate, or at least had so reduced and impaired it that it was necessary for Granville Cecil, Sr., to come to their assistance, and to pay and furnish about eleven thousand dollars to save the lands to the young couple. The testator, Granville Cecil, in doing so, looked well to the interest of his daughter, and so arranged the property that she should have the use and benefit of it through her life, with remainder to her children. He, no doubt, realized that to turn the property into the hands of either his daughter or son-in-law would mean a waste and destruction such as had characterized their married life. When Mrs. DeLong sued for divorce, her father came to her rescue, aiding and assisting in every way possible by taking the part of his child. He paid the attorney fees

and costs of the case, and in addition, arranged for her and her children's maintenance and support. When Margaret, the second daughter, married and had domestic troubles, the father likewise came to her assistance and, after her divorce, provided for her education and maintenance. These daughters, however, complain that this provision was meagerly, niggardly. The facts are that Mrs. DeLong was permitted to draw $125.00 per month, from her father's account at the bank. This in a town the size of Danville was amply sufficient to maintain her and the children; and whether it was or not, she was a married woman, much above the age of twenty-one years, and her father was not under any legal obligations to support or maintain her. She had married against his wishes when she was sixteen years of age; had helped to waste an estate of eighty thousand dollars or more in a few short marital years, and it was not strange that her father should have carefully limited her allowance. If he had failed to limit her income, he would have been remiss in parental duty. She had not learned the value of money, nor had she earned any. In Margaret's case, he allowed her fifty dollars per month, at first, and then one hundred dollars per month, upon which to live. Business acumen was lacking in the testator's children. If facts such as are laid bare here showing extravagance, wasting of property and estate by the three children, could have been brought forth by the contestants against the testator, it might have justified the jury in finding the testator to be of unsound mind. That the testator knew his duty to the natural objects of his bounty is clearly shown by the wise provisions of his will, which place his property in the hands of frugal, careful business men as trustees, to be managed and administered for the use and benefit of his children and grandchildren. Under the provisions of these two instruments, which are contested, the three children are bounteously provided for through their natural lives. It is not necessary for them to work or even to have an occupation. The testator tried to inculcate habits of industry and frugality into his children, but they are not required to exert themselves. Whether they do or not, they will have a life income sufficiently large to meet the requirements of their station in life. In addition to this, the grandchildren of Cecil will come into an estate which will be sufficient for their maintenance and education. The object of the testator was to preserve and conserve his property for the

use and benefit of those he loved, his children and grandchildren.

In the preparation of the two instruments, much time and deliberative care was expended. As far back as 1893 Granville Cecil began to consider the making of a will. At that time he called his personal friend, the Hon. John W. Yerkes, now of Washington City, but then a distinquished lawyer at the Danville bar, and he drafted for Cecil a will much in the nature of the one in question here. This was done under the direction of the testator. Again, in 1897, Mr. Yerkes prepared a codicil for Mr. Cecil, and these two instruments were offered in evidence upon the hearing of the case in the circuit court. They do not, however, differ materially from the will and codicil probated in the county court. Their similarity to the papers here in question rather support than impeach them. From this, it will be observed that Cecil considered the making of a will at different times through twenty years or more, and that the drafting of the last codicil on January 31, 1911, occupied some two or three weeks' time, and he was in consultation repeatedly with his lawyer, Mr. Bagby. He had before him then the original will and codicil drafted by Mr. Yerkes. The testator himself struck out certain provisions of the original will, and penciled in other words. From this outline Mr. Cecil and his lawyer, Mr. Bagby, worked out the present codicil. The instrument itself displays much skill and mental grasp. It undertakes to provide against every contingency, and in any event to save and preserve the estate to his children and his children's children. In this, he was moved by a wise and beneficent purpose. The sad experience which he had undergone with his family, their extravagance and improvidence, forced upon him the conclusion that his long years of toil and effort in acquiring and preserving his property would be worse than wasted should these children come suddenly into the possession of it. He feared for them and wished to protect them.

The chief objection of the contestants to the will is, the placing of the property in trust. It is not claimed that the children or grandchildren are not amply provided for. The portion of property allotted to each is sufficient for all reasonable requirements. They, however, insist that the father who made the will ought to have allowed them to take and manage the estate free from the interference of a trustee. The testator would

have failed in his duty to his children had he done so. Judging from past experience, no doubt, the property in their hands would have vanished and they would have been dependent and in need. With this view, the children would not now agree, but it will not be many years until they, as well as their children, will recognize and commend the wise terms of the will of Granville Cecil, Sr.

Much stress is placed by contestants upon the cursing, profane and abusive language used by testator toward his wife and children. This is intended to show an unnatural disposition and an unreasonable and depraved condition. The language attributed to the testator is quite unseemly, but the stress of circumstances and the annoying and preverse attitude of the members of his family, accompanied with extravagance and the wasting of money, naturally irritated the thrifty, frugal temperament of the father. The abusive language, however, when brought to its last analysis is largely imaginative. How-beit, it has never been held that the use of profane or abusive language of itself incapacitates one to dispose of his property by will. One may possess testamentary capacity, and yet be guilty of the use of profane and abusive language, even towards those nearest in relation to him. In the Lewis will case, reported in 33 N. J. Equity 227, it is said:

"Miserly disposition and habits, unclean modes of life, dishonesty, even to theft, profanity and violence of temper, of themselves, do not affect the claim of testamentary capacity, for obviously, a man may be a thief, a miser, unclean, profane and of ungovernable temper, and yet have testamentary capacity."

Every man possessing the requisite mental powers may dispose of his property by will in any way he may desire, and a jury will not be permitted to overthrow it and to make a will for him to accord with their ideas of justice and propriety, nor are they permitted to suspect away the right of the testator to dispose of his property in accordance with his own will and desire. Hildreth v. Hildreth, 153 Ky. 597. The mere fact that the testator has not divided his property equally among his children, or that there may be a seeming injustice done some child or other devisee, or the fact that the property has been placed in trust, or otherwise limited, even though not in accordance with the opinion or conception of a court or jury, or all these things together, will not suffice to over-

throw a testamentary paper where the maker is of sound mind and the instrument is free from fraud and undue influence.

Just how the jury in this case arrived at the conclusion that the two papers in contest were not the last will of Granville Cecil, Sr., is unknown to this court. Undoubtedly their minds and attention were distracted from the facts to abstract theories and opinions given by expert witnesses on the trial. It is shown by affidavits in the record that certain of the jurors, immediately upon the rendering of the verdict, declared that their verdict was not based upon the idea that Granville Cecil, Sr., was of unsound mind, or that he was unduly influenced in the execution of the papers, but that the jury regarded and considered the will unfair.

It has been held by this court that the mere opinion of a non-expert witness that the testator was of unsound mind at the time of the execution of the paper, is not sufficient, in the absence of other evidence, to entitle the contestants to have the case submitted to the jury. In Hildreth's Exors. v. Hildreth, 153 Ky. 601, this court, in speaking of the opinion of non-expert witnesses, said:

"The evidence as to his life and conduct was of far greater value in establishing his testamentary capacity than the mere opinions of witnesses."

In that case several non-expert witnesses expressed the opinion that the testator was not competent to make a will, and the jury found the instrument, in part, not to be the will of the testator, but this court, in reversing the case, said:

"In this view of the case it is our duty, in reversing the judgment, not to direct the granting of a new trial, but to require the circuit court to set aside so much of the verdict and judgment as set aside that part of the will containing devises to the remaindermen, and by its judgment order the county court to admit the entire will to probate as the last will and testament of A. H. Hildreth, deceased. This course was in effect followed in Bush, &c., v. Lisle, 89 Ky. 402."

But for the evidence of the two expert witnesses, Drs. Green and Runnalds, this court would direct the probation of the will as in the Hildreth case. Neither of these doctors herein examined Cecil with a view to ascertain his mental condition, and their opportunity to observe his acts and conduct were quite limited.

The trial court should have sustained the motion of appellants for peremptory instructions to the jury to find and return a verdict in favor of the will, made at the conclusion of the evidence. There was not sufficient evidence to sustain the verdict. The whole course of life of Granville Cecil negatives the allegations of unsoundness of mind, and "involutional melancholia." The wise provisions of the will and codicil evidence a mind which knew and understood the nature and value of his property, the natural objects of his bounty and the duty he owed to them. In the language of the learned judge who delivered the opinion in the case of Bush v. Leslie, 89 Ky. 399:

"It seems to us, as the record stands, there is a total failure by the contestants to show lack of mental capacity on the part of the decedent to make the will, and, in our opinion, evidence of undue influence by the devisees, or any other person, is equally unsatisfactory, *and the verdict of the jury can be accounted for only on the supposition their attention was diverted from facts proved to abstract theories of physicians who never examined nor had knowledge of the actual mental condition of decedent when the paper was executed.*"

Upon another trial, if the evidence be in substance the same as upon the last one, the trial judge will instruct the jury to find and return a verdict sustaining the will and codicil.

Judgment reversed. The whole court except Chief Justice Settle sitting and concurring.